**ARENA FOOTBALL LEAGUE, INC., as licensee of Gridiron Enterprises, Inc., an Illinois Corporation, Plaintiff,**

v.

**E. Guy ROEMER, Roemer
& Featherstonhaugh,
P.C., defendant.**

**No. 96 C 1769.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 26, 1998.

John C. Sciaccotta, Kelly, Olson, Rogan and Siepker, Chicago, IL, Ronald J. Kurpiers, II, Fort Lauderdale, FL, for Plaintiff.

Michael P. Tone, Wilson, Elser, Moskowitz, Edelman & Dicker, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, United States Magistrate Judge.

Plaintiff, Arena Football League, Inc. ("AFLI"), filed this two-count action against Defendants, E. Guy Roemer ("Roemer") and Roemer & Featherstonhaugh, P.C., for legal malpractice and breach of fiduciary duty. In its first count, AFLI alleges that Roemer was negligent in advising AFLI employees that the AFLI's member teams could seek coverage under a single workers' compensation account through the State of Delaware and that he concealed material information regarding this application from the AFLI's Board of Directors. In its second count, the AFLI alleges that Defendants are liable for breach of fiduciary duty, both by providing negligent advice and by mishandling litigation that resulted from the negligent advice. Defendant has moved for summary judgment on both counts of the Amended Complaint. For the reasons set forth below, summary judgment is denied.

## FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 12(M) and 12(N) statements, and pertinent submissions attached thereto.

### The Parties

Plaintiff Arena Football League, Inc. ("AFLI"), a Delaware corporation, is a nonprofit membership organization and the successor to an Illinois corporation of the same name, which for the purposes of differentiation will hereinafter be referred to as "the League." The League was formed in 1987 for the purpose of holding indoor football games in various cities across the United States. (Defendants E. Guy Roemer and Roemer & Featherstonhaugh, P.C.'s Statement of Material Facts as to Which No Genuine Issue Exists ("Defs.' 12(M) Stmt.") ¶ 1; Plaintiff's Response to Defendant's Local Rule 12(M) Statement ("Pl.'s 12(N) Stmt.") ¶ 1.) This case arises in part out of state laws that required the various league teams ("member teams") to maintain worker's compensation insurance for their employees and personnel. (Defs.' 12(M) Stmt. ¶ 6.)

Defendant E. Guy Roemer ("Roemer") is an attorney licensed to practice law in the states of New York and Florida and is a senior partner at the law firm of Roemer & Featherstonhaugh, P.C., also a Defendant in this case. (Defs.' 12(M) Stmt. ¶ 2; Pl.'s 12(N) Stmt. ¶ 3.) In 1991, the AFLI Board of Directors hired Roemer as general counsel to represent AFLI in all areas regarding its legal needs. (Additional Facts Warranting Denial of Summary Judgment ("Pl.'s 12(N)(3)(b) Stmt.") ¶ 1; Deposition of Guy Roemer ("Roemer Dep."), Vol. 1, at 60–62.) Roemer & Featherstonhaugh, P.C. is and was at all relevant times a law firm organized as a professional corporation under the laws of the State of New York with its principal office located in Albany, New York. (Defs.' 12(M) Stmt. ¶ 3.)

*The Events*

The parties agree that between 1987 and 1993—the relevant time period in this lawsuit—one of any team's largest operating expenses were its workers' compensation insurance premiums. (Defs.' 12(M) Stmt. ¶ 6; Pl.'s 12(N) Stmt. ¶ 6.) Between 1987–1990, each member team paid the same premium by virtue of the League's holding itself out as a "single-entity employer" located in Illinois. (Pl.'s 12(N) Stmt. ¶ 7.) By holding itself out as a single-entity employer, the League "was able to retain a single carrier to provide workers' compensation and pay premiums which were lower than those charged in [the] home states of some of its members." (*Id.*)

In 1990, however, the National Council of Compensation Insurance ("NCCI") directed that the League's member teams cease this practice. The NCCI is the plan administrator for the assigned risk market[1] in 23 states, including Illinois and the League's state of incorporation, Delaware. (*Id.*) In a written decision, the NCCI ruled that the League was not a single-entity employer and therefore not entitled to coverage by a single carrier. (*Id.*) Instead, Plaintiff alleges, the NCCI concluded that the individual member teams, and not the League, employed the players (Plaintiff's Amended Complaint, Ex. A to Def.'s 12(M) Stmt., ¶ 10); Defendants concede that this was the NCCI's ruling, but neither party has furnished a copy of the decision itself, nor has either side identified the date the decision was entered. The ruling effectively required each member team thereafter to apply for its own workers' compensation insurance coverage in the state of its home office. (*Id.* ¶ 11.)

In response to the NCCI ruling, the AFLI[2] hastily formed what it called the Ad Hoc Committee on Workers' Compensation and, assisted by Roemer (who had since been hired as the AFLI's general counsel) and Jardin Insurance Agency–Michigan, its insurance broker, attempted to devise a strategy to standardize premium costs for its member teams. (*Id.* ¶ 13.) Roemer apparently believed that the most effective strategy would be simply to get the NCCI to reconsider its ruling; he wrote that agency at least two letters (one dated October 22, 1992 and the other dated December 14, 1992) asking them to do just that after the ruling was handed down.[3] (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 15–18; Letters From Roemer to NCCI Representative Pamela Tackett, Exs. 3, 6 to Pl.'s 12(N)(3)(b) Stmt.) That strategy ultimately proved ineffective, however; on February 3, 1993, the NCCI sent Roemer a letter affirming its prior ruling that the AFLI would not be considered a single-entity employer. (Pl.'s 12(N)(3)(b) Stmt. ¶ 19; 2/3/93 Letter From NCCI Representative Pamela Tackett to Roemer, Ex. 7 to Pl.'s 12(N)(3)(b) Stmt.)

In early April 1993, the workers' compensation insurance carrier for two member teams, the Tampa Bay Storm and the Albany Firebirds, notified the respective owners of those two teams, Robert Gries and Glenn Mazula, that the teams' insurance premiums were being raised. (Defs.' 12(M) Stmt. ¶¶ 10, 12.) Tampa Bay's annual insurance premium was slated to be increased by at least $340,000—from $60,000 to between $400,000 and $500,000—and Albany's by almost $350,000—from $90,000 to $428,000. (*Id.*) Both owners promptly called then-AFLI Commissioner Joseph O'Hara and told him their respective teams would sit out the 1993 season if they could not obtain lower annual premiums. (Pl.'s 12(N)(3)(b) Stmt. ¶ 23.)

There appears to be no dispute that the AFLI determined to attempt to obtain lower premiums for the Tampa Bay and Albany franchises. Neither does there appear to be any dispute that applying for insurance cov-

---

**1.** According to the AFLI, the assigned risk market "is the involuntary insurance market where insurance is 'force-placed' randomly to insurance carriers that underwrite business in a certain state." (Pl.'s 12(N)(3)(b) Stmt. ¶ 20; Deposition of Terrence Delehanty ("Delehanty Dep.") at 25–26.)

**2.** The League reincorporated in Delaware as the AFLI in December 1991. (Plaintiff's Amended Complaint, Ex. A to Def.'s 12(M) Stmt., at ¶ 13.)

**3.** The record does not indicate whether the NCCI's original decision contemplated an appeal or other formal review process, nor whether Roemer's letters constituted an appeal or a request for review.

erage in Delaware as a single-entity employer—this despite the fact that Delaware was a state "covered" by the NCCI's 1990 ruling—is the course of action the AFLI ultimately took in this regard. What the parties do dispute, and what ultimately is the subject of this litigation, is the extent to which Roemer participated in the decision to apply for coverage in Delaware. Defendants' version first: Defendants assert that Mark Higley, the AFLI's director of business and financial affairs, came up with the idea of obtaining insurance coverage through the State of Delaware without any input from Roemer.[4] (Def.'s 12(M) Stmt. ¶¶ 8, 16, 17; Deposition of Mark Higley ("Higley Dep.") at 7, 16, 33.) After learning of this proposal from Higley, the story goes, Roemer advised the AFLI that to make the plan work it would have to establish a "presence" in Delaware as fully and as completely as possible. (Def.'s 12(M) Stmt. ¶ 17; Roemer Dep. at 211.) Defendants further assert that it was Higley's responsibility, not Roemer's, "to make certain that Arena's presence in Delaware was established," (Def.'s 12(M) Stmt. ¶ 18), relying for this assertion on Tampa Bay Storm owner Robert Gries's testimony that he (Gries) believed that to be the case. (Deposition of Robert Gries ("Gries Dep.") at 18.) Higley testified, moreover, that he did not view Roemer as an expert on workers' compensation insurance issues. (Def.'s 12(M) Stmt. ¶ 18; Higley Dep. at 18.)

Defendants assert that the Board of Directors did in fact authorize the establishment of an AFLI office in Delaware. (Def.'s 12(M) Stmt. ¶ 20; O'Hara Dep. at 80.) Pursuant to the Board's grant of authority, Higley prepared and signed an application for workers' compensation insurance through the State of Delaware on behalf of the AFLI—an application that Roemer testified he had no input on or even saw until after it was submitted.[5] (Def.'s 12(M) Stmt. ¶¶ 21, 28;

Roemer Dep. at 192, 201; Delaware Insurance Application, Ex. 30 to Pl.'s 12(N)(3)(b) Stmt.) To corroborate Roemer's testimony, Defendants offer Higley's testimony to the effect that he did not believe the application was provided to Roemer for review prior to its submission. (Def.'s 12(M) Stmt. ¶ 25; Higley Dep. at 23.) They also rely on the following colloquy between Higley and AFLI's counsel at Higley's deposition to bolster their position that Roemer did not advise Higley as to the contents of the application:

> **Question:** And at any time before, during, or after the completion of those applications, did Mr. Roemer encourage you to make misrepresentations or state inaccuracies to either [the Delaware insurance carrier later assigned to AFLI,] Travelers, NCCI, or anyone else on the subject of worker's compensation issues?

> **Answer:** No.

(Higley Dep. at 44.) Finally, Defendants, paraphrasing Commissioner O'Hara's deposition testimony, assert that "no member of Arena's Board of Directors ever told O'Hara that they relied on Roemer in making the decisions to procure workers compensation insurance in Delaware." (Def.'s 12(M) Stmt. ¶ 35; O'Hara Dep. at 78.)

The AFLI, predictably, has a much different view of Roemer's involvement in the Delaware scheme—it asserts that Roemer played an active role in the decision to pursue the Delaware option. (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 26, 27.) There is ample support for this assertion in the record. Donald Balmes, a Jardin employee who took part in Ad Hoc Committee negotiations, testified that he participated in several conference calls with Roemer in which the two discussed the possibility of obtaining coverage for the AFLI through Delaware.[6] (Deposition of Donald

---

4. Higley testified that it was "[his] idea to investigate Delaware as well as several other states under the charge from [O'Hara] to secure or investigate insurance premiums that are affordable." (Higley Dep. at 33.)

5. It is undisputed that Roemer did not sign the application. (Defs.' 12(M) Stmt. ¶ 21; Pl.'s 12(N) Stmt. ¶ 21.)

6. The extent of Donald Balmes's involvement in preparing the Delaware application is unclear, but the AFLI asserts, responding to Defendants' intimation that Higley prepared the application singlehandedly, that Balmes "spoke to Roemer and Higley for advice and direction during the compilation and submission of the application." (Pl.'s 12(N) Stmt. ¶ 21.) Additionally, Balmes's signature appears underneath Higley's on the

Balmes ("Balmes Dep.") at 41.) He further testified that Roemer told him the AFLI "[was] a Delaware corporation, that all of the employees of at least these two teams were, in his mind, employees of the league, and if the application was filed under the name of Arena Football and they had established a business presence [in Delaware], that it should fly." (*Id.* at 46.)

Members of AFLI's Board of Directors also recounted that Roemer participated in the decision to obtain coverage through Delaware. Board member Jerry Kurz, asked whether he knew who had been charged with filling out the Delaware insurance application, responded that "anything that was supposed to be done with insurance, the person in the league office was Mark Higley, and he was to work in conjunction and under the guidance of Guy Roemer being counsel for the league." (Deposition of Jerry Kurz ("Kurz Dep.") at 26.) Board member William Niro took it one step further, testifying that Roemer rendered legal advice to the AFLI on the Delaware issue:

And I recall that there was some talk about at some point in time we may have to move the league offices and everything to Delaware and that would complete all of this and make everything all right and good and proper. And I remember there was a lot of questions about the propriety of this or the—you know, the workers' comp issues and single entities' [sic] employers and so on.

And I recall that Roemer was on some sort of mission, if you want to call it that, a high priority research project, to come to grips with this issue and advise the league in the proper course of action. That was his charge. And I recall seeing legal memoranda on the subject.

I remember Guy Roemer advising the board and answering questions from the board on various issues or things that they would raise. I recall the certainty with which he drew the conclusions that he

drew as to whatever it was [we] did or didn't do.[7]

(Deposition of William Niro ("Niro Dep.") at 21.)

Finally, Higley provided damaging testimony about the extent of Roemer's involvement in preparing the Delaware insurance application. Higley testified that because he had only a "street-level understanding" of the single-entity employer issue, he relied on Roemer's legal expertise in preparing the Delaware insurance application. (Higley Dep. at 89, 90.) He further testified that O'Hara *instructed* him to defer to Roemer on "legal matters." (*Id.* at 91.)

In addition to presenting evidence that Roemer participated heavily in the decision to obtain insurance coverage through the State of Delaware, the AFLI has presented evidence that the AFLI's Board of Directors were not informed of the decision, allegedly made by Higley, Roemer, and Balmes, to submit the Delaware application. (Pl.'s 12(N)(3)(b) ¶ 38.) Board member Kurz testified that he did not know until "after the fact" that the application had been filed. (Kurz Dep. at 28.) Likewise, Niro testified that he did not "remember" the Board ever approving the submission of the Delaware insurance application. (Niro Dep. at 11.) The AFLI also disputes Defendants' assertion that the Board authorized the opening of an office in Delaware, again relying on the testimony of Kurz and Niro. (Pl.'s 12(N)(3)(b) ¶ 38.) Kurz, parroting his earlier testimony, testified that he did not learn about the move until "after the fact." (Kurz Dep. at 28.) Niro, meanwhile, testified that O'Hara presented the move to the Board in a purely "informational, this is what we're going to do" manner, the clear import of his testimony being that the issue was presented as if it were already decided. (Niro Dep. at 42.)

The parties agree that the application Higley prepared and ultimately submitted on

---

final application (Delaware Insurance Application, Ex. 30 to Pl.'s 12(N)(3)(b) Stmt.), and the AFLI asserts without dispute that Balmes was responsible for formally submitting the application. (Pl.'s 12(N)(3)(b) Stmt. ¶ 34; Higley Dep. at 42.)

7. Niro also testified that Roemer, who had initially indicated to him that a relocation to Delaware would not be necessary, advised him only *after* the Delaware insurance application had been submitted that a relocation would be necessary. (Niro Dep. at 39.)

behalf of the AFLI to the State of Delaware contained a number of material misrepresentations, particularly as to the status of the AFLI as a single-entity employer and the extent of the AFLI's "presence" in Delaware.[8] (Pl.'s 12(N)(3)(b) Stmt. ¶¶ 35, 36, 37.) The State of Delaware initially overlooked those misrepresentations; it accepted the AFLI's application some time in late 1993 and assigned the AFLI's claim to Travelers Insurance Company, a private insurance carrier selected at random from its assigned risk pool. (*Id.* ¶ 39.) After examining the AFLI's application more closely, however, representatives at Travelers began to suspect that the application contained inaccuracies about the AFLI's contacts in Delaware. (*Id.* ¶ 40.) Travelers initiated a full-scale investigation, determined that the application was a sham, and brought suit against the AFLI in Delaware federal court to recover money it had paid out on claims during the pendency of the policy. (*Id.* ¶ 51; Def.'s 12(M) Stmt. ¶ 31.) The suit ultimately settled (neither party specifies when) for $224,578.66. (Pl.'s 12(N) Stmt. ¶ 33.)

The parties dispute the extent to which Roemer participated in the *Travelers* litigation. Defendants assert that his participation was minimal, relying on O'Hara's deposition testimony to the effect that Roemer was only a "resource" to the attorneys hired by the AFLI to represent it in the *Travelers* litigation and that he (O'Hara) "believe[d]" Roemer was not the AFLI's counsel of record in that litigation. (Def.'s 12(M) Stmt. ¶ 32; O'Hara Dep. 32–33.) O'Hara further testified that he believed Roemer's stance to be that the AFLI "[was] not going to win the litigation" and should settle. (Def.'s 12(M) Stmt. ¶ 32; O'Hara Dep. at 37.) Finally, Defendants make the unremarkable, and unchallenged, assertion that the AFLI's Board of Directors was the ultimate decisionmaker as to whether to settle or proceed with the litigation. (Def.'s 12(M) Stmt. ¶ 32; O'Hara Dep. at 37.)

The AFLI concedes Roemer was not the counsel of record, but notes the testimony of John Parkins, who did act as counsel to the AFLI in the litigation, that from the beginning of the litigation he (Parkins) sent all pleadings, legal memoranda, and discovery requests to Roemer for his approval. (Pl.'s 12(N)(3)(b) Stmt. ¶ 55; Parkins Dep. at 8–11, 43, 49, 56.) The AFLI further notes that Niro testified to Roemer's telling him he was "the person responsible for" conducting the *Travelers* litigation. (Pl.'s 12(N)(3)(b) Stmt. ¶ 53; Niro Dep. at 50.)

As to Roemer's "forecast" for the litigation, the AFLI suggests Roemer went to significant effort to keep the AFLI in the dark about the precariousness of its situation. The AFLI alleges that Roemer's outlook as to the course the *Travelers* litigation would take was initially favorable. As proof, it points to a November 30, 1993 memorandum Roemer sent O'Hara, Mazula, Gries, Higley, Kurz, and Balmes on the heels of the AFLI's being served by Travelers, wherein Roemer opined that the Travelers suit was "winnable" and "defendable." (Pl.'s 12(N) Stmt. ¶ 32; Roemer Memorandum of November 30, 1993, Exhibit 39 to Pl.'s 12(N)(3)(b) Stmt.) It also points to the testimony of Board member Niro, who recalled that in Board meetings Roemer was "animated about how Travelers had no case, how he had done everything absolutely appropriate … he acted like he would lay down in front of a speeding train to assure the league that the league did everything on the up and up." (Pl.'s 12(N)(3)(b) Stmt. ¶ 36; Niro Dep. at 35–36.) Only after Travelers filed a motion for summary judgment, the AFLI alleges, did Roemer advise it that the case should settle. (Pl.'s 12(N) Stmt. ¶ 32; Memorandum Letter From Roemer to Kurz, Ex. 45 to Pl.'s 12(N)(3)(b) Stmt.) The AFLI insists that had Roemer acted as a reasonably prudent attorney and researched the claim to determine

---

8. The application, for example, listed the application's insured as the AFLI despite the NCCI's ruling, applicable to Delaware, that the AFLI could not be considered a single-entity employer. (Pl.'s 12(N)(3)(b) Stmt. ¶ 35; Delaware Insurance Application, Ex. 30 to Pl.'s 12(N)(3)(b) Stmt.) Further, the application listed as the AFLI's principal place of business 1013 Center Road, Wilmington, Delaware, an address which indisputably "was nothing more than a mere CT 'service office' designated to accept service of process, subpoena, and other documents." (Pl.'s 12(N)(3)(b) Stmt. ¶ 36; Delaware Insurance Application, Ex. 30 to Pl.'s 12(N)(3)(b) Stmt.)

Arena's actual chances of winning the suit, "he could have advised Arena to settle earlier and Arena would have avoided paying costly attorney fees incurred in litigating the case." [9] (Pl.'s 12(N)(3)(b) Stmt. ¶ 69.) The AFLI does not identify the point at which Roemer reasonably should have settled the case, but asserts that it lost in "in excess of $150,000" in attorney's fees over and above the settlement amount. (*Id.* ¶ 68.)

Defendant asserts that after the *Travelers* litigation was settled, the AFLI's member teams "reimbursed" it for the settlement loss and attorney's fees. (Defs.' 12(M) Stmt. ¶ 34.) It further asserts that the AFLI "benefitted" from the *Travelers* ordeal because obtaining insurance coverage through the State of Delaware "permitted Albany, Tampa Bay, and the other Arena teams to play the 1993 season as scheduled." (*Id.* ¶ 38.) Finally, it asserts, presumably as further proof that obtaining insurance coverage through the State of Delaware benefitted the AFLI, that "the most recent Arena team member franchise was sold for $2,000,000, and the Arena member teams in 1993 only had a value of approximately $250,000." (*Id.* ¶ 39.)

The AFLI rejects the notion that the fact its member teams contributed toward the settlement means that the AFLI suffered no loss due to Roemer's conduct. The AFLI notes that it is a not-for-profit membership corporation and that "the individual teams were assessed a fee by Arena to cover any shortfall in the cost of the settlement." (Pl.'s 12(N)(3)(b) Stmt. ¶ 72.) Thus, it concludes, "any assessment made by member teams is not and cannot be construed as any reimbursement to Arena because the assessed fee was an additional capital contribution made by the member teams to the AFLI further asserts that it was the sole defendant in the *Travelers* litigation and that it paid the settlement amount in full to Travelers" (*id.*), presumably before it assessed the "fee" to its member teams. As to Defendants' claim that the AFLI benefitted from its pursuit of insurance coverage through the State of De-

laware, the AFLI notes that O'Hara himself testified the 1993 season would not have been ruined if Albany and Tampa Bay had decided not to play (O'Hara Dep. at 76), and that in any event the "[n]egative consequences, if any, resulting to Arena by Albany and Tampa Bay sitting out the 1993 season were negligible in comparison to all damages incurred due to Roemer's negligent advice and failure to advise in procuring workers' compensation insurance in Delaware." (Pl.'s 12(N) Stmt. ¶ 37.) Finally, regarding Defendants' veiled assertion that the selling price of the member teams increased dramatically as a result of the AFLI's obtaining insurance coverage through the State of Delaware, the AFLI "denies that Arena's success had anything to do with Albany an [sic] Tampa Bay participating in the 1993 season or the specious Delaware 'workers' compensation solution.'" (*Id.*)

## PROCEDURAL HISTORY

On March 27, 1996, the AFLI filed a three-count Complaint against Roemer individually and Jardin Insurance Agency–Michigan. Count I of the Complaint charged Roemer with legal malpractice, claiming that he advised the AFLI to file the Delaware insurance application even though he knew or should have known the application contained information that he knew or should have known was false. The AFLI also claimed in Count I that Roemer failed to disclose the Delaware insurance scheme to the AFLI's Board of Directors, and that he "knowingly" allowed claims to be submitted to Travelers on behalf of players for the AFLI who, under the Delaware insurance policy that had been obtained, were uninsurable risks. Count II, directed at the both the Roemer Defendants and Jardin, charged breach of fiduciary duty. It essentially repeated Count I's allegations of negligence, but omitted the "negligent advice" claim previously made against Roemer (that claim would be inapplicable to Jardin) and replaced it with the claim that both Roemer and Jardin failed to keep the AFLI's Board of Directors adequately apprised of the status of the *Travelers* litigation. Final-

---

9. In addition to being less than candid about the AFLI's chances of success in the *Travelers* litigation, the AFLI asserts that Roemer failed to noti-

fy the AFLI of discovery requests, with the result that sanctions were entered against the AFLI by the Delaware court. (Pl.'s 12(N)(3)(b) ¶ 64.)

ly, Count III charged Jardin with negligent misrepresentation for its involvement in preparing the Delaware insurance application.

On September 10, 1996, the Honorable Elaine E. Bucklo granted Jardin's motion to dismiss the case as to it for want of personal jurisdiction. Less than a month later, on October 7, 1996, the AFLI filed an Amended Complaint dropping Count III of the original Complaint and adding the law firm Roemer & Featherstonhaugh, P.C. as a defendant. The case was transferred to this court by consent of the parties on February 24, 1997, and on June 24, 1997, Defendants moved for summary judgment on both counts of the AFLI's Amended Complaint.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate whenever the pleadings, depositions, answers to interrogatories, and admissions on file, together with any submitted affidavits, fail to raise "a genuine issue of material fact[.]" FED.R.CIV.P. 56(c). In considering a motion for summary judgment, the court accepts as true the fact set forth by the non-movant, and draws all justifiable inferences in that party's favor. *Wade v. Byles*, 83 F.3d 902, 904 (7th Cir.), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 311, 136 L.Ed.2d 227 (1996). A party opposing summary judgment may not rest solely upon the pleadings, however, but must set forth specific facts showing the existence of a genuine issue for trial. *Id.* at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). This means the nonmovant must do something more than merely "raise a 'metaphysical doubt' as to the material facts." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997) (quoting *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. Analysis

In their motion for summary judgment, Defendants argue that the AFLI will be unable to establish causation or damages for its legal malpractice and breach of fiduciary duty claims. As to causation, Defendants' primary contention is that Roemer cannot be held liable for legal malpractice because Higley, not Roemer, filled out the Delaware insurance application. (Memorandum In Support of Defendants' Motion for Summary Judgment ("Mem.Supp.Mot.Summ.J.") at 4–5.) They buttress this argument by noting the additional undisputed fact that the AFLI's Board of Directors had ultimate decision-making authority to pursue the Delaware plan. (*Id.* at 5.) Second, Defendants contend that the AFLI's causation argument is defeated by the facts that: (1) the AFLI is guilty of fraud and is precluded, under the doctrine explained in *Goldstein v. Lustig*, 154 Ill.App.3d 595, 107 Ill.Dec. 500, 507 N.E.2d 164 (1st Dist.1987), from seeking the court's assistance to relieve it of the consequences of its fraud; (2) Roemer was not the AFLI's counsel of record; (3) the AFLI had no chance of winning the *Travelers* litigation anyway; and (4) the AFLI's Board of Directors, not Roemer, made the ultimate decision to settle the case. (*Id.* at 5–8.) As to damages, Defendants argue that the AFLI incurred no damages from the *Travelers* litigation because the AFLI's member teams "reimbursed" it for the settlement loss. (*Id.* at 8.) For this reason, they conclude, to award the AFLI damages in this case would be to award it a "double recovery." (*Id.* at 10.) All of Defendants' arguments will be considered in turn below.[10]

#### 1. Legal Malpractice and Breach of Fiduciary Duty: The Elements

The elements of a legal malpractice claim and a breach of fiduciary claim are essentially identical, and are not in dispute. To prove legal malpractice, a plaintiff in Illinois [11] must establish: (1) the existence of an

---

10. Defendants' argument that the AFLI lacks standing to sue concededly rests on their contentions that Plaintiff cannot establish causation and damages. As discussed below, however, this court concludes that Defendants have not established the absence of material disputes on these issues; accordingly, the court declines to dismiss the AFLI's claims for lack of standing.

11. For reasons unknown to this court, the parties appear to assume that Illinois law governs this case. It is not at all clear, however, that under

attorney-client relationship ("duty"); (2) a negligent act or omission on the part of the attorney ("breach"); (3) causation; and (4) damages. *Serafin v. Seith,* 284 Ill.App.3d 577, 587, 219 Ill.Dec. 794, 672 N.E.2d 302, 309 (1st Dist.1996). Similarly, a successful claim for breach of fiduciary duty in Illinois requires proof of: (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) resulting damages. *LaSalle Bank Lake View v. Seguban,* 937 F.Supp. 1309, 1324 (N.D.Ill.1996). As the court's summary of Defendants' arguments indicates, Defendants' motion for summary judgment raises only the issues of causation and damages.

**2. Causation**

██ Defendants' arguments as to causation have no merit. As a general rule, causation is a question of fact for the jury in legal malpractice cases, *Metrick v. Chatz,* 266 Ill. App.3d 649, 652, 203 Ill.Dec. 159, 639 N.E.2d 198, 200 (1st Dist.1994), and this case is no exception. Consider first the questions of fact that abound with respect to the AFLI's claim that Roemer negligently advised it to prepare the Delaware insurance application. Contrary to Defendant's position that the undisputed facts in this case show that Roemer's involvement in the decision to pursue insurance coverage through the State of Delaware was at best minimal, the AFLI has presented evidence that: (1) Roemer spoke on numerous occasions with Jardin representative Donald Balmes about the possibility of the AFLI's obtaining coverage through Delaware; (2) at least one Board member understood Roemer to be broadly in charge of the AFLI's workers' compensation insurance issues; (3) Roemer participated heavily in discussions with the Board about the Delaware plan, and even advised the Board as to its feasibility; and (4) Higley relied on Roemer's legal advice in preparing the Delaware insurance application. In this court's view, this evidence justifies the inference Roemer negligently recommended to the AFLI that it apply for insurance coverage through the State of Delaware.

██ Defendants urge, however, that Roemer cannot be held liable for legal malpractice because it is undisputed both that Roemer played no part in filling out the misrepresentation-ridden application and that the AFLI's Board of Directors, not Roemer, ultimately made the decision to apply for insurance through the State of Delaware. (Defs.' Mem.Supp.Mot.Summ.J. at 4–8.) Neither fact is controlling. Defendants' reliance on the fact that Roemer did not himself fill out the application ignores completely the gist of the AFLI's claim: that Roemer negligently advised it to do so.[12] In Illinois, the law is clear that a plaintiff may assert a cause of action for legal malpractice when an attorney's pre-litigation advice causes the plaintiff to be sued. *See Jackson Jordan, Inc. v. Leydig, Voit & Mayer,* 199 Ill.App.3d 728, 733, 145 Ill.Dec. 755, 557 N.E.2d 525, 529 (1st Dist.1990) (observing, in a case where the plaintiff alleged his defendant attorney's negligent advice had caused him to be sued, that "[t]he entire litigation and concomitant expenses might have been avoided if [the defendant's] assertedly negligent advice had not been given") *rev'd on other grounds,* 158 Ill.2d 240, 198 Ill.Dec. 786, 633 N.E.2d 627 (1994); *cf. Kerschner v. Weiss & Co.,* 282 Ill.App.3d 497, 504–505, 217

Illinois choice of law rules—which apply to this federal court sitting in diversity, *CSX Transp., Inc. v. Chicago and North Western Transp. Co.,* 62 F.3d 185, 188 (7th Cir.1995)—the law of Illinois should govern: Roemer conducts business in New York, the AFLI is incorporated in Delaware, the "harm" clearly occurred in Delaware, and the record is ambiguous at best as to where the bulk of Roemer's alleged misconduct occurred. *Cf. Jones v. State Farm Mutual Automobile Ins. Co.,* 289 Ill.App.3d 903, 917, 224 Ill.Dec. 677, 682 N.E.2d 238, 248 (1st Dist.1997). The court will expect the parties to address the issue in any further submissions.

12. Defendants appear to awaken to the nature of Plaintiff's claim in their reply brief, there clinging to Higley's testimony that Roemer never explicitly advised him to make misrepresentations on the Delaware insurance application. Their reliance on that portion of Higley's testimony is misplaced. Although Higley declined to take the position that Roemer specifically instructed him to make misrepresentations on the application, Higley did testify that he relied on Roemer's legal advice in preparing the application. That testimony rationally raises the inference that Roemer advised Higley that applying for insurance coverage through the State of Delaware was legally permissible.

Ill.Dec. 775, 667 N.E.2d 1351, 1356–57 (1st Dist.1996) (holding that plaintiff's complaint, which alleged that "no competent lawyer, exercising a reasonable degree of care and skill" would have advised the plaintiff to withdraw from partnership, stated a claim for legal malpractice). Defendants' reliance on the allegedly undisputed fact that the AFLI's Board of Directors made the decision to apply for insurance through the State of Delaware is similarly unavailing. To begin with, the AFLI has presented evidence sufficient to create a dispute of fact on the issue of whether the Board authorized the Delaware plan. But even if it had not, Roemer would still not be entitled to summary judgment. Illinois law clothes all clients, in all cases, with decision-making authority on strategic decisions, *County of Cook v. Patka*, 85 Ill.App.3d 5, 11, 40 Ill.Dec. 284, 405 N.E.2d 1376, 1380 (1st Dist.1980), and so to accept Defendants' argument would be effectively to hold that attorneys are immune to suit. As Plaintiff points out, the logic of Defendants' position is that an attorney should have a rock-solid defense in nearly every case—that the client could ultimately have rejected his negligently given advice. A client is entitled to rely on the advice of her attorney, however, and Defendants provide no basis for the suggestion that Roemer's client should have known better than to accept Roemer's counsel.

The AFLI has also presented enough evidence to preclude summary judgment on its claim that Roemer mishandled the *Travelers* litigation and thereby cost it unnecessary attorneys' fees. According to the AFLI, first, Roemer "double-billed" it by directing the AFLI's counsel of record, John Parkins, to send all pleadings, legal memoranda, and discovery requests to him for approval. He compounded the double-billing problem, it asserts, by negligently handling the case—he asserted upon the AFLI's being served that the *Travelers* suit was "winnable" and "defendable" and only advised the AFLI to settle the case after reading Travelers motion for summary judgment, almost a full year later. In this court's view, this evidence rationally raises the inference of negligence, particularly when read in conjunction with the evidence that Roemer knew, at the time the Travelers suit was filed, that the NCCI had ruled the AFLI was not a single-entity employer.

Defendants' arguments to the contrary are unavailing. First, Defendants erroneously rely on *Goldstein* for the proposition that the AFLI is a fraudfeasor. *Goldstein* reaffirmed the general rule that Illinois courts "will not aid a fraud feasor who invokes the court's jurisdiction to relieve him of the consequences of his fraud." *Goldstein*, 154 Ill. App.3d at 603, 107 Ill.Dec. 500, 507 N.E.2d at 170. There, a dentist whose on-the-job fraud was discovered by his employer went to his attorney for advice. The attorney advised him to stand pat and wait to be fired, and then to file suit for wrongful discharge—this even though the dentist's employment agreement provided better post-termination benefits if he resigned of his own option. The dentist took the attorney's advice and brought suit against his employer upon being fired. The case ultimately settled, but for an unsatisfactory amount because the settlement amount did not include the termination benefits the dentist would have received had he resigned of his own option. The trial court dismissed the dentist's subsequent suit for legal malpractice and the appellate court affirmed, reasoning that the dentist's action was "an attempt to reduce the economic consequences of his fraudulent conduct" by recovering damages from his attorney "to which he was not entitled under his employment agreement." *Id.* at 602–03, 107 Ill.Dec. 500, 507 N.E.2d 164.

The problem with Defendants' *Goldstein* argument is that it assumes, incorrectly, that the facts surrounding the underlying fraud in this case are not in dispute. As discussed above, in this case there is evidence that Roemer advised the AFLI to commit the fraud that resulted in its being sued—indeed, that evidence forms the basis of the AFLI's separate "negligent advice" claim. In *Goldstein* there was no such evidence; the client had clearly committed the fraud on his own before he sought legal advice. Thus, *Goldstein* is inapposite.

Defendants' remaining arguments may be dismissed in relatively short order. First,

although it is undisputed that Roemer was not the counsel of record in the *Travelers* litigation, the evidence Plaintiff has presented suggests that Roemer nevertheless played a key role in handling paperwork and formulating strategy.

Second, the fact that it is unlikely the AFLI would have prevailed in the *Travelers* litigation even if Roemer had performed flawlessly is irrelevant. It is true that in *Claire Associates v. Pontikes*, 151 Ill.App.3d 116, 104 Ill.Dec. 526, 502 N.E.2d 1186 (1st Dist.1986), the case relied on by Defendants for this argument, the Illinois appellate court observed that "no malpractice exists unless counsel's negligence has resulted in the loss of an underlying cause of action, or the loss of a meritorious defense if the attorney was defending in the underlying suit." *Id.* at 122, 104 Ill.Dec. 526, 502 N.E.2d at 1190. In that case, however, the plaintiff corporation specifically alleged that its attorney's negligence prevented it from prevailing in the underlying action. *Id.* at 121, 104 Ill.Dec. 526, 502 N.E.2d 1186, 502 N.E.2d at 1189. In this case, however, the AFLI is not claiming that "but for" Roemer's negligent performance it would have prevailed in the *Travelers* litigation; the AFLI claims that "but for" Roemer's negligent performance it would have incurred less in legal fees and would not have been hit with discovery sanctions. In *Glass v. Pitler*, 276 Ill.App.3d 344, 212 Ill.Dec. 730, 657 N.E.2d 1075 (1st Dist.1995), the Illinois appellate court explained that a plaintiff may sue her attorney for mishandling a prior case even where the prior case has settled, so long as the damages flowing from the alleged malpractice can be "factually established." [13]

*Id.* at 351, 212 Ill.Dec. 730, 657 N.E.2d at 1080. As noted above, Plaintiff has presented sufficient facts to raise the inference that, but for Roemer's negligence in handling the Travelers litigation, it would have accrued less in legal fees.

As for Defendants' final argument, the fact that the AFLI had the ultimate authority to settle the case does not help Defendants. As noted above, Illinois law clothes all clients, in all cases, with decision-making authority on strategic decisions. *Patka*, 85 Ill.App.3d at 11, 40 Ill.Dec. 284, 405 N.E.2d at 1380. In any event, as also noted earlier, the AFLI is not claiming that Roemer's mishandling of the *Travelers* litigation resulted in settlement losses that it otherwise would not have had to pay. Accordingly, this court rejects Defendants' arguments as to causation.

### 3. Damages

 Defendants' arguments as to damages fare no better. Defendants' primary argument is that any damages awarded to the AFLI in this case would amount to a windfall or "double recovery" for it because the AFLI's member teams already reimbursed it for the settlement amount. [14] As the AFLI argues, however, Defendants are barred from reliance on this defense by the "collateral source" doctrine. Under the collateral source rule, as it is called, "benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." *Wilson v. Hoffman Group*, 131 Ill.2d 308, 320, 137 Ill.Dec. 579, 546 N.E.2d 524, 530 (1989).

---

**13.** The court emphasized that it was not relieving plaintiffs of their ultimate burden "to present genuine issues of material fact as to all elements of the malpractice claim" and cited with approval *Sheppard v. Krol*, 218 Ill.App.3d 254, 161 Ill. Dec. 85, 578 N.E.2d 212 (1st Dist.1991), a case identical in its reasoning to *Pontikes*. *Glass*, 276 Ill.App.3d at 351, 212 Ill.Dec. 730, 657 N.E.2d at 1079–80.

**14.** Defendants also argue that the AFLI should not be allowed to recover in this case because it actually benefitted from the Delaware scheme, first because obtaining insurance coverage through the State of Delaware "permitted" Albany and Tampa Bay to play in the 1993 season, and second because the AFLI's member teams

have appreciated in value since the AFLI implemented the "workers' compensation solution." As to the first asserted "benefit," Defendants have failed to demonstrate that it would have been impossible to secure Tampa Bay's and Albany's commitment to play without resorting to fraud. Put another way, awarding the AFLI damages in this case cannot be construed as a "windfall" if proper legal advice would have put it in the same position as the negligent advice. As to the second asserted "benefit," it is sheer speculation on Defendants' part that the AFLI's member teams appreciated in value *because* the AFLI sought insurance coverage through the State of Delaware.

As the Supreme Court of Illinois explained long ago,

> [n]o injustice is done to a person negligently injuring another in requiring him to pay the full amount of amount of damages for which he is legally liable without deduction for compensation which the injured person may receive from another source which has no connection with the negligence, whether that source is a claim for compensation against his employer, a policy of insurance against accidents, a life insurance policy, a benefit from a fraternal organization or a gift from a friend.

*Stifle v. Marathon Petroleum Co.*, 876 F.2d 552, 560 (7th Cir.1989) (quoting *Bryntesen v. Carroll Const. Co.*, 27 Ill.2d 566, 568, 190 N.E.2d 315, 317 (1963)). The "no connection" language in the Supreme Court's justification of the rule is important; for that requirement to be met, the allegedly independent source of the disputed payment must in no way have been responsible for causing, in whole or in part, the damages sought to be recovered by the party seeking to invoke the collateral source rule. *See, e.g. Stifle*, 876 F.2d at 560 (explaining that application of the collateral source rule is justified in the context of workers' compensation payments because those payments are made pursuant to statutory obligation, without regard to any negligence on the employer's part); *Bryntesen*, 27 Ill.2d at 568, 190 N.E.2d at 316–17 (same).

Application of the collateral source rule to the facts of this case is straightforward. Defendants have not alleged that the member teams were in any way responsible for causing the damages the AFLI seeks to recover in this case, and there is no independent evidence in the record to suggest that they were. Accordingly, the member teams have "no connection" to the alleged negligence that forms the basis of this lawsuit. Moreover, as members of the AFLI, the teams will presumably benefit from any recovery the AFLI may achieve in this litigation.

Defendants have made two arguments that the collateral source rule should not apply in this case, but both fall wide of the mark. Their first argument, that the member teams were "connected to the events and alleged negligence at hand" and thus are not wholly independent of Roemer, reflects, as indicated by the above analysis, a misunderstanding of the collateral source rule's "no connection" requirement. Of course the member teams were connected to Roemer's alleged negligence in the literal sense—the very purpose of Roemer's seeking insurance coverage through the State of Delaware was to benefit the member teams, in particular the Tampa Bay Storm and the Albany Firebirds. The problem with Defendants' argument is that the member teams can in no way be said to have *caused* the damages flowing from Roemer's alleged negligence.

Defendants' second argument that the collateral source rule should not apply is that the member teams may be the "real party in interest" in this case. The concern here, Defendants appear to argue, is not that the AFLI will receive a double recovery but that they (Defendants) will potentially be subject to double payment if the member teams decide to bring suit against them. At least one case has held the risk of double payment to be a valid consideration in determining whether to apply the collateral source rule. *State Security Ins. Co. v. Frank B. Hall & Co.*, 109 F.R.D. 95, 97 (N.D.Ill.1985). Here, however, there simply is no danger that the member teams will sue Defendants separately. Indeed, it is difficult to conceive of a scenario in which the member teams would have standing to do so; the AFLI was the only named defendant in the *Travelers* litigation and thus the only party legally obliged to pay Travelers the settlement amount. Further, any attorney's fees wrongfully assessed by Defendants were assessed against the AFLI, not the member teams. Accordingly, summary judgment is denied on the damages element of the AFLI's legal malpractice and breach of fiduciary duty claims.

## CONCLUSION

The court denies summary judgment on Counts I and II of the AFLI's Amended Complaint. Questions of material fact remain as to the causation and damages ele-

ments of Plaintiff's legal malpractice and breach of fiduciary claims.