# Illinois Official Reports

## Appellate Court

---

### *Nelson v. Padgitt*, 2016 IL App (1st) 160571

---

| | |
|---|---|
| Appellate Court Caption | DWIGHT NELSON, Plaintiff-Appellant, v. DONALD LEE PADGITT and PADGITT, PADGITT, & PEPPEY, LTD., Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0571 |
| Filed | November 1, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-6855; the Hon. Margaret Ann Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William P. Suriano, of Law Offices of William P. Suriano, of Riverside, for appellant.<br><br>Thomas B. Underwood, Michael D. Sanders, and Richard J. VanSwol, all of Purcell & Wardrope, Chtrd., of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1    After losing a breach of contract lawsuit against his former employer, plaintiff Dwight Nelson sued his lawyers for malpractice. Nelson alleged that his lawyer and his law firm had negligently represented him when negotiating an employment agreement with the employer. Because the trial court did not err in holding that Nelson's suit was filed outside the two-year statute of limitations, we affirm. Nelson's claim of malpractice against his lawyer is "inseparable" from his claims against his employer, and his legal malpractice claim accrued at least by the time he filed his suit against the employer because by then it was "plainly obvious" that he had been injured as a result of legal malpractice.

¶ 2                                BACKGROUND

¶ 3    In 2011, Dwight Nelson decided to leave his branding and packaging design business, HBN Brandesign, and join another company, Launch Creative Marketing, while bringing his HBN clients to Launch. Nelson hired Donald Lee Padgitt and Padgitt, Padgitt, & Peppey, Ltd., to represent him in negotiating an employment agreement with Launch. Nelson signed the agreement on June 6, 2011.

¶ 4    Six months later, on January 19, 2012, Launch terminated Nelson's employment. The letter informing Nelson of his firing specified that under the employment agreement, Launch could terminate Nelson for cause if the revenue collected from Nelson's old clients totaled less than $250,000 over the first six months of employment.

¶ 5    On October 31, 2012, Nelson sued Launch and one of its employees for breach of contract and fraud. In the complaint, Nelson alleged that Launch breached the obligations of good faith and fair dealing by failing to define Nelson's job description and to support his work and unnecessarily reducing and delaying the billing of the clients Nelson had brought to Launch. Had Launch not done so, Nelson alleged, he would have met the $250,000 target during his first six months of employment and not been fired for cause. Nelson attached to the complaint a copy of the employment agreement and the January 19 letter terminating his employment.

¶ 6    On December 4, 2014, the trial court granted summary judgment in Launch's favor. In a written decision, the trial court pointed out that Nelson was "a successful businessman, and was represented by competent counsel throughout the negotiation of his employment agreement." The trial court attributed the outcome to "Nelson's failure to properly negotiate on his own behalf," which gave Launch much discretion under the employment agreement. In sum, "Nelson was in a position at the bargaining table to ensure none of these complications arose by better protecting his interests through negotiation."

¶ 7    On July 7, 2015, Nelson sued Padgitt and his firm for legal malpractice. Nelson alleged he hired Padgitt based on Padgitt's experience in transactional matters and told Padgitt his goal of securing a steady income for the next few years and eventually retiring. Padgitt negotiated the employment agreement with Launch, and Nelson signed it on Padgitt's recommendation. But Nelson alleged Padgitt neglected to tell him that (1) the agreement did not provide steady income past six months, (2) Launch could fire Nelson after six months if the revenue from his customers fell short of the specified target, (3) Launch had the ability to insure that Nelson would not meet his target, (4) Launch had broad discretion in billing and defining Nelson's job description, or (5) the agreement lacked a specific start date. Nelson alleged that any

reasonable attorney would have negotiated an agreement that would have better protected Nelson. Finally, Nelson alleged that he had suffered damages, including future benefits from employment with Launch, the value of the customers he brought to Launch, the cost of settling his suit with Launch, and the cost of suing Launch. He estimated these damages exceeded $100,000.

¶ 8 On February 10, 2016, the trial court dismissed Nelson's complaint with prejudice for the reason that the two-year statute of limitations for legal malpractice barred his claims. (The trial court did not consider extra-record evidence submitted by Padgitt, and neither will we.)

¶ 9                                                 STANDARD OF REVIEW

¶ 10 We review a trial court's dismissal of a complaint based on the statute of limitations *de novo*. *Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 22.

¶ 11                                                         ANALYSIS

¶ 12 An action for legal malpractice must be filed within two years from the time the plaintiff "knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2012). Actual knowledge is not necessary to trigger the limitations period, nor does the plaintiff need knowledge of a specific defendant's negligent conduct or knowledge of the existence of a malpractice claim. *SK Partners I, LP v. Metro Consultants, Inc.*, 408 Ill. App. 3d 127, 130 (2011). Instead, the limitations period begins when the plaintiff has a reasonable belief that the injury was caused by the lawyer's wrongful conduct and the plaintiff, therefore, has an obligation to inquire further. *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673 (1997).

¶ 13 To be considered injured, a legal client must suffer a loss for which he or she may seek monetary damages. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Generally, that loss will not occur until the plaintiff has suffered an adverse judgment, settlement, or dismissal of the underlying action caused by the attorney's alleged negligence. *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 356 (1998). If the damages are as yet "speculative," then the cause of action has not yet accrued and the malpractice suit is premature. *Id.* at 353.

¶ 14 But, "speculative" in this context means "only if [the damages'] existence itself is uncertain, not if the amount is uncertain or yet to be fully determined." *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307. Further, a malpractice claim can accrue before an adverse judgment if it is "plainly obvious *** that he [or she] has been injured as the result of professional negligence or where an attorney's neglect is a direct cause of the legal expense incurred by the plaintiff." (Internal quotation marks omitted.) *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 70 (2007) (quoting *Lucey*, 301 Ill. App. 3d at 355, 358).

¶ 15 On January 19, 2012, Nelson was fired and informed in writing that his termination was under the employment agreement negotiated for him by Padgitt. Even if Nelson had not read the employment agreement before signing it (which would have been an odd action, given his experience in business), Nelson should have realized at that point that the employment agreement was not drafted in his best interests. Nelson suffered an economic injury on his firing because the agreement also stipulated a loss of salary and commission on termination for

cause. But Nelson did not file his legal malpractice claim until July 7, 2015, well after the two-year limitations period had run.

¶ 16    If Nelson did not know of his injury on January 19, 2012, he certainly should have known of it by October 31, 2012, when, with the assistance of a new attorney, he filed suit against Launch based on the termination and the text of the agreement. Even if we assume that the limitations period did not begin to run until October 31, it had still expired before he filed his legal malpractice claim.

¶ 17    Two past cases inform our analysis. In *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, Janousek alleged that his former business partners fired him and then froze him out of future opportunities. *Id.* ¶ 3. Janousek sued his former partners and then, three years later, sued his former attorneys at Katten, alleging that those attorneys had actually assisted his ex-colleagues in harming Janousek's business prospects. *Id.* ¶ 6. We held that Janousek waited too long to sue the Katten attorneys because he knew that he had been injured, "even though he may not yet have known that [Katten]'s representation was partly responsible and that their conduct gave rise to a cause of action." *Id.* ¶ 21. Janousek's claim that his partners had defrauded him "cannot be separated" from the claim that Katten had failed to protect him from that fraud. *Id.* Like Janousek, Nelson knew he had been injured when he was fired and was informed that he was being terminated under the employment agreement. Even if Nelson did not yet know that Padgitt had been negligent in negotiating his employment agreement, he was on notice of the problem and had a duty to inquire further (by examining that agreement, the language of which made plain that it did not provide Nelson with the type of protection he asserts he asked Padgitt to ensure). *Castello v. Kalis*, 352 Ill. App. 3d 736, 745 (2004). That inquiry would have shown the intertwining of his financial loss with Padgitt's work on the employment agreement. See also *Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165, ¶ 67 (plaintiffs knew that former attorneys had committed malpractice in helping plaintiffs' former partners incorporate competing company when plaintiffs signed release against former partners; limitations period for legal malpractice claim began to run at that point because claims were inseparable).

¶ 18    Nelson characterizes *Janousek* as different than his case because the Katten attorneys were alleged to have actually aided Janousek's opponents, while there is no evidence that Padgitt acted in league with Launch. But there is nothing in *Janousek* to indicate that its holding is limited to its facts. Malpractice does not require bad faith on the part of the attorney.

¶ 19    In *Carlson*, 2015 IL App (1st) 140526, Carlson settled a dispute with his former business partners through a mediation while represented by attorneys. He later decided that the settlement was inadequate and his partners had defrauded him. *Id.* ¶¶ 8-9. But he waited more than two years to sue his former attorneys, and this court upheld the trial court's dismissal on statute of limitations grounds. *Id.* ¶ 41. Similarly to *Janousek*, even if Carlson did not yet know that his attorneys were partly responsible for his injury, he knew that he had been injured. *Id.* ¶ 39. "Carlson's identification of one wrongful cause of his injuries initiates his limitations period as to all other causes, particularly when, as here, he claims his partners engaged in fraud and the defendants failed to protect him from fraud, those claims are inseparable." *Id.*

¶ 20    Again, Nelson knew in 2012 that he had been injured by his former colleagues at Launch, and he knew that the employment agreement negotiated by Padgitt was partly responsible for his inability to protect himself from the alleged wrongdoings. Like *Carlson*, his claim of malpractice against Padgitt is "inseparable" from his claims against Launch.

¶ 21    Nelson attempts to distinguish *Carlson* by arguing that Carlson's damages were "fixed," while his were dependent on the outcome of his suit against Launch and thus he could not file his malpractice suit until after that suit concluded. If Nelson's damages were only "speculative," then the limitations period would not have begun until after his employment suit was completed. *Lucey*, 301 Ill. App. 3d at 353. But, as noted, damages are "speculative" only if their existence is uncertain, not their amount. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307. Damages do not have to be "fixed" in a precise amount to start the limitations period, and Nelson knew that he had suffered economic loss from his firing well before his suit against Launch ended. This makes his case different from *Lucey*, where "actionable damages were a mere potentiality" until there was an adverse judgment. 301 Ill. App. 3d at 359.

¶ 22    A legal malpractice claim can accrue before an adverse judgment if it is "plainly obvious" that a plaintiff has been injured as a result of professional negligence. *Lucey*, 301 Ill. App. 3d at 358. In 2012, Nelson (a sophisticated businessperson eventually assisted by a new attorney) knew that his economic loss from the firing stemmed directly from Launch's reliance on the employment agreement, which had been negotiated by Padgitt and plainly did not include the economic protections that Nelson allegedly had instructed Padgitt to include. He did not need the trial court's adverse judgment to know that he had been harmed by Padgitt. See *Dancor International*, 288 Ill. App. 3d at 674-75 (where plaintiff filed federal criminal complaint against employee for embezzlement, plaintiff also had sufficient information to file malpractice suit against accountant who had failed to detect employee's wrongdoing). This distinguishes his case still further from *Lucey*, where Lucey was the defendant in the suit underlying his legal malpractice claim. 301 Ill. App. 3d at 352. Lucey had a much stronger argument that he did not know of his former attorneys' bad advice until after the adverse judgment because he was not the one to pursue legal action. *Id.*

¶ 23    Finally, a legal malpractice claim can accrue before an adverse judgment "where an attorney's neglect is a direct cause of the legal expense incurred by the plaintiff." *Estate of Bass*, 375 Ill. App. 3d at 70. Nelson could have (and should have) known that the text of the employment agreement, for which Padgitt was partly responsible, directly caused his legal expenses in litigating against Launch. *Cf. Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 369-70 (2007) (where plaintiffs could not have known that letter agreements for real estate sale drafted by attorney were faulty until trial court granted defendants' motion for summary judgment, limitations period did not begin to run until adverse judgment entered); *York Woods Community Ass'n v. O'Brien*, 353 Ill. App. 3d 293, 299 (2004) (when attorney fees were incurred, it was not yet clear that fees were due to malpractice, so "damages remained speculative, and no cause of action had accrued"). This is not a case where the connection between the financial loss and the attorney's negligence is faint or too complex for a layman to grasp.

¶ 24    Nelson's strongest argument emphasizes the policy underlying the "prematurity doctrine"—that if we enforce the limitations period too strictly, plaintiffs will respond by filing their legal malpractice suits long before any underlying litigation has finished and this will clog the dockets with malpractice suits that must be repeatedly stayed or dismissed without prejudice before they can be fully litigated. See *Romano v. Morrisroe*, 326 Ill. App. 3d 26, 32 (2001) (discussing impact of premature malpractice litigation). We recognize these sound policy concerns and that some decisions have been more lenient with plaintiffs in response to these concerns. *Lucey*, 301 Ill. App. 3d at 357 (prematurity doctrine should be applied for

judicial economy and preservation of attorney-client relationship). But the legislature chose to write a statute of limitations into the Code of Civil Procedure, and while a balancing act, our ruling is consistent with the legislature's wishes.

¶ 25    Affirmed.