2020 IL App (1st) 191953
Nos. 1-19-1953 & 1-19-1973 (consol.)
Opinion filed November 30, 2020
Modified upon denial of rehearing December 31, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| SUBURBAN REAL ESTATE SERVICES, INC., and BRYAN BARUS, | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 5295 |
| | ) | |
| WILLIAM ROGER CARLSON JR. and CARLSON PARTNERS, LTD., | ) | |
| | ) | Honorable |
| | ) | Diane M. Shelley, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pierce and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Suburban Real Estate Services, Inc., and Bryan Barus retained defendants William Roger Carlson Jr. and his law firm, Carlson Partners, Ltd., for legal advice in dissolving a company they co-owned with ROC, Inc. (Plaintiffs will be collectively referred to as "Barus" and defendants as "Carlson.") After Barus followed Carlson's advice, ROC, Inc. (ROC), sued Barus alleging breach of his fiduciary duties. Barus retained new attorneys. They informed him that he likely had a legal malpractice claim against Carlson but that he should wait until the claims by ROC were resolved

before pursuing it. The trial court in the underlying lawsuit found Barus had breached his fiduciary duties and ordered him to pay to ROC 50% of the fair value of the assets he improperly transferred out of the company. After settling his claims with ROC, Barus filed a legal malpractice complaint against Carlson.

¶ 2    Carlson moved for summary judgment on the grounds that the two-year statute of limitations for legal malpractice claims barred Barus's claims. The trial court granted Carlson's motion, finding that Barus's legal malpractice claims began to accrue when his new attorneys advised him he may have a legal malpractice claim against Carlson. The court concluded Barus knew or should have known when he paid attorney's fees to the new law firm that he had a legal malpractice claim against Carlson.

¶ 3    Barus argues he timely filed his malpractice complaint within two years of the judgment against him, at which time he first knew he had been injured by Carlson's purported negligence. Barus asserts that filing a malpractice claim before then would have been premature because, had he prevailed in the underlying lawsuit, he would have had no injury. We agree. As the defendant in the underlying lawsuit, Barus was not injured for the purposes of triggering the statute of limitations until entry of the adverse judgment in the underlying lawsuit. Further, we reject Carlson's contention that summary judgment was warranted because Barus would have had to pay 50% of the fair value of the company's assets to ROC under the company's operating agreement. Instead, Barus suffered no damages from the purported legal malpractice. The damages the trial court imposed related directly to the steps Barus took in dissolving the company and would not have been owed had he not breached his fiduciary duties.

¶ 4    We reverse the trial court order granting summary judgment and remand for further proceedings.

¶ 5                                  Background

¶ 6      Bryan Barus is the principal and sole owner of Suburban Real Estate Services, Inc., a commercial real estate management company. In February 2006, Suburban Real Estate and another company, ROC, formed a joint company, ROC/Suburban LLC. Suburban Real Estate and ROC each owned a 50% interest in the new company, which acted as a vendor to Suburban Real Estate in supplying commercial property management services. (Michael Siurek, the sole shareholder of ROC, is not a party to the appeal.)

¶ 7      In 2010, Barus decided to end Suburban Real Estate's involvement in ROC/Suburban LLC and retained Carlson and his law firm to represent his company in unwinding the business relationship. On the advice of Carlson, Barus sent a "break-up" letter to Siurek, notifying him of the steps he planned to take to terminate his company's relationship with ROC/Suburban LLC as of July 1, 2010, including no longer using ROC/Suburban LLC as a vendor and taking most of ROC/Suburban LLC's employees.

¶ 8      On the advice of Carlson, Barus implemented the steps described in the letter including taking most of ROC/Suburban's employees in June 2010, while Suburban Real Estate was still a member of ROC/Suburban and before the vendor relationship ended on July 1. About a month later, in August 2010, ROC sued Barus in Du Page County alleging breach of fiduciary duty. Carlson continued as Barus's attorney for a while; Barus eventually retained new attorneys, Gaspero & Gaspero Attorneys at Law, P.C. (Gaspero), to represent him. At a pretrial conference in April 2013, the trial judge told Gaspero he would likely find that Barus's conduct constituted a breach of fiduciary duty if the case proceeded to trial. The judge further said that, to the extent Barus's conduct was recommended by Carlson, the advice constituted legal malpractice and a malpractice claim was "a hundred percent" certainty.

¶ 9     Gaspero told Barus about the trial judge's comments and discussed the possibility of a legal malpractice claim against Carlson. Gaspero also contacted an attorney who specializes in legal malpractice to assess the viability of a malpractice claim against Carlson.

¶ 10    After a bench trial, the trial court entered judgment for ROC on June 17, 2015. Barus reached a settlement with ROC and filed this legal malpractice case on May 26, 2016, alleging that, as a result of Carlson's legal advice, he had to pay more than $500,000 in claims and attorney's fees to ROC.

¶ 11    Carlson moved for summary judgment, arguing that Barus knew or should have known about his alleged negligence in 2011, when Barus retained and started paying attorney's fees to Gaspero or by 2013 at the latest, when the trial judge told Gaspero that a malpractice claim was a certainty. Carlson argued that the applicable two-year statute of limitations barred Barus's malpractice complaint. In response, Barus argued that the statute of limitations began to run on the entry of the adverse judgment in the ROC litigation in 2015 and, thus, his complaint was timely.

¶ 12    The trial court entered a written order granting Carlson's motion for summary judgment, finding that Barus had notice of his malpractice claim as early as 2010, when ROC filed the underlying lawsuit, and no later than April 2013, when the judge told his new attorney, Gaspero, that a malpractice action against Carlson was a "one-hundred percent certainty" and Gaspero sought advice from another attorney about when a malpractice claim needed to be filed.

¶ 13    The court noted that a legal malpractice claim usually does not begin to accrue until the plaintiff has suffered an adverse judgment, settlement, or dismissal in the underlying action. But, citing this court's decisions in *Construction Systems, Inc. v. FagelHaber, LLC*, 2019 IL App (1st) 172430, and *Nelson v. Padgitt*, 2016 IL App (1st) 160571, the trial court stated that a legal malpractice claim can accrue before an adverse judgment where a client has to pay legal fees as a

result of attorney neglect. The trial court found Barus's claim barred. It concluded that Barus discovered or should have discovered the defective legal advice at least as of April 2013, when Gaspero began investigating a potential malpractice claim and Barus incurred attorney's fees "as a direct result of defendants' allegedly-negligent legal advice." (The trial court also entered summary judgment in favor of Gaspero on Carlson's third-party complaint for contribution. Carlson separately appealed that order in appeal No. 1-19-1973, which has been consolidated with appeal No. 1-19-1953 but stayed pending the resolution of this appeal.)

¶ 14                                    Analysis

¶ 15                              Standard of Review

¶ 16    Summary judgment should be applied where no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). The trial court may grant summary judgment after considering "the pleadings, depositions, admissions, exhibits, and affidavits on file in the case" and construing that evidence in favor of the nonmoving party. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). Summary judgment aids in the expeditious disposition of a lawsuit, but it is a drastic measure that should be allowed only "when the right of the moving party is clear and free from doubt." *Id.* We review the trial court's grant of summary judgment *de novo*. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 17                             Statute of Limitations

¶ 18    An action for legal malpractice must be filed within two years from the time the plaintiff "knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2018). To trigger the limitations period, the plaintiff must have a reasonable belief that the injury was caused by the lawyer's wrongful conduct and the plaintiff, therefore, has an obligation to inquire further. *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288

Ill. App. 3d 666, 673 (1997). But "[k]nowledge that an injury has been wrongfully caused does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action," and thus the statute of limitations may run despite the lack of actual knowledge of wrongful conduct. (Internal quotation marks omitted.) *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 13 (citing *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004)).

¶ 19    "Injury" requires a legal client suffer a loss for which he or she may seek monetary damages. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Generally, a plaintiff does not sustain an injury until an adverse judgment, settlement, or dismissal in the underlying action. *Nelson*, 2016 IL App (1st) 160571, ¶ 13. But "a malpractice action may accrue before the trial court enters an adverse judgment if it is plainly obvious that the plaintiff has been injured as the result of professional negligence or where an attorney's neglect is a direct cause of the legal expense incurred by the plaintiff." (Internal quotation marks omitted.) *FagelHaber*, 2019 IL App (1st) 172430, ¶ 20; *Nelson*, 2016 IL App (1st) 160571, ¶ 14; see also *Goran v. Glieberman*, 276 Ill. App. 3d 590, 595-96 (1995) (client's cause of action for legal malpractice accrued when client retained and paid fees to successor attorneys to duplicate initial attorney's efforts).

¶ 20    Like the trial court, Carlson relies on *FagelHaber* and *Nelson* to argue that the statute of limitations began as early as October 2010, when Barus retained Gaspero, incurring legal expenses related to Carlson's purportedly negligent legal advice, and no later than April 2013, when Gaspero advised Barus he likely had a legal malpractice claim. Carlson contends the two-year statute of limitations had expired when Barus filed the legal malpractice case in May 2016.

¶ 21    Barus asserts, however, that attorney's fees he paid Gaspero were not actionable for attorney malpractice, as no clear finding of attorney neglect had been shown in the underlying

case. Rather, at that time, his malpractice claim against Carlson amounted to speculation. Then, in June 2015, on the entry of the adverse judgment, his cause of action accrued. For support, Barus relies on *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349 (1998), and *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364 (2007).

¶ 22    In *Lucey*, the plaintiff, relying on his attorney's advice, solicited clients from his employer before resigning to start his own company. *Lucey*, 301 Ill. App. 3d at 351. The plaintiff's former employer sued him. *Id.* at 352. While the lawsuit by the former employer was pending, the plaintiff sued his attorney for malpractice. *Id.* The trial court dismissed the malpractice complaint, finding it premature because the plaintiff had not yet sustained damages, as the underlying lawsuit by the former employer remained pending. *Id.* The appellate court affirmed, holding that the legal malpractice action accrued when the former employer's lawsuit against the plaintiff concluded. *Id.* at 355. The plaintiff could possibly prevail against the former employer, so the damages were "entirely speculative until a judgment is entered against the former client or he is forced to settle." *Id.* "[A] cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Id.* at 356. The court explained that requiring a client to bring a provisional malpractice suit would undermine judicial economy and the attorney-client relationship. *Id.* at 357.

¶ 23    In *Warnock*, defendants-attorneys represented the sellers in a real estate transaction. *Warnock*, 376 Ill. App. 3d at 365. Before closing, the purchasers asked for more time to obtain financing. *Id.* at 366. The defendants drafted a letter to the purchasers' attorney agreeing to extend the closing date should the purchasers deposit money in an escrow account. *Id.* The letter agreement also contained a liquidated damages clause stating that the earnest money would be

forfeited if the closing did not occur. *Id.* When the purchasers failed to secure the necessary financing before closing, the earnest money was released to the sellers, who refused to return it to the purchasers. *Id.*

¶ 24     The purchasers sued the sellers alleging unjust enrichment. *Id.* The sellers retained another law firm to represent them in the purchasers' lawsuit. The trial court held that the letter agreements defendants drafted were unenforceable and entered judgment against the sellers. *Id.* at 367. The sellers then filed a legal malpractice action against the defendants, who moved for summary judgment. The defendants argued the two-year statute of limitations began to accrue when the sellers retained another law firm to defend them against the purchasers. *Id.* The sellers countered that the statute of limitations began to run when the judgment was entered against them in the underlying action. *Id.* The trial court granted summary judgment for the defendants. *Id.*

¶ 25     The appellate court reversed, reasoning that, when the purchasers filed the underlying action, the sellers did not know whether the purchasers would or would not recover the earnest money held in escrow. *Id.* at 370. The appellate court stated that "a cause of action for legal malpractice will not accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Id.* at 372. Until the trial court entered judgment in the purchasers' favor, the sellers did not actually discover and reasonably could not have discovered that the letter agreements were negligently prepared. *Id.* Thus, the entry of the adverse judgment marked the date on which the statute of limitations period commenced. *Id.*

¶ 26     *Lucey* and *Warnock* are directly on point. As in those cases, Barus did not suffer a realized injury until the trial court entered the judgment against him on June 17, 2015. Before then, Barus's damages were "entirely speculative," because he might have prevailed in the underlying case.

Although Barus paid attorney's fees to Gaspero before the judgment, there had not yet been a clear finding of attorney neglect. If Barus had filed a malpractice complaint against Carlson and prevailed in the underlying lawsuit, the malpractice complaint would have been pointless and, as this court found in *Lucey*, would undermine judicial economy and the attorney-client relationship. *Lucey*, 301 Ill. App. 3d at 357.

¶ 27     We reject defendant's reliance on *FagelHaber* and *Nelson* for the proposition that the payment of attorney's fees here constituted a "plainly obvious" injury triggering a claim of legal malpractice.

¶ 28     In *Nelson*, the attorney negotiated an employment agreement on the plaintiff's behalf, which stipulated a loss of salary and commission on termination for cause. *Nelson*, 2016 Il App (1st) 160571, ¶ 15. After the plaintiff was terminated for cause, he brought a malpractice action against his former attorney for failing to negotiate an employment contract that was in his best interests. *Id.* ¶¶ 4, 7. There, an adverse judgment was unnecessary for the plaintiff to discover injury—its existence was established when the client filed the underlying suit alleging he had already sustained injury. *Id.* ¶ 16. The court differentiated the case from *Lucey* "where 'actionable damages were a mere potentiality' until there was an adverse judgment." *Id.* ¶ 21 (quoting *Lucey*, 301 Ill. App. 3d at 359). The court explained that, because the client in *Lucey* was the defendant in the underlying suit, he did not know of his injury "until after the adverse judgment because he was not the one to pursue legal action." *Id.* ¶ 22.

¶ 29     In *FagelHaber*, the plaintiff, a steel fabricator, retained the defendant-lawyer to prepare and record a mechanic's lien. *FagelHaber*, 2019 IL App (1st) 172430, ¶ 4. The lawyer filed the mechanic's lien but failed to provide notice to a bank, which later filed a mortgage against the property. *Id.* When litigation over the liens ensued, the client retained a different attorney and

learned that the previous attorney had not provided proper notice of the mechanic's lien to the bank. *Id.* ¶ 6. The plaintiff sued the attorney for legal malpractice, asserting that failure to perfect the mechanic's lien resulted in its lien being subordinate to the bank's mortgage lien. *Id.* ¶ 8. The attorney moved for summary judgment, asserting that the statute of limitations barred the plaintiff's legal malpractice action because, when plaintiff retained new counsel, the plaintiff knew or should have known about the failure to serve the required statutory notice of its mechanic's lien on the bank. *Id.* ¶ 9.

¶ 30    The trial court granted the motion for summary judgment, and the appellate court affirmed. Relying on *Nelson*, the court found that the plaintiff's legal malpractice action against the law firm for failing to perfect its mechanic's lien accrued when it paid attorney's fees to replacement counsel. *Id.* ¶ 24. The court noted that replacement counsel sent a letter to the original attorney asking for his cooperation in addressing the "problematic situation" in regard to priority of the plaintiff's mechanic's lien. *Id.* The letter demonstrated (i) the replacement attorney knew of the law firm's error in perfecting the mechanic's lien, (ii) the error caused injury to the plaintiff, and (iii) the plaintiff paid the replacement attorney for services to minimize the law firm's negligence. *Id.* ¶ 29.

¶ 31    The court distinguished *Warnock* and similar cases that have "reiterated the admonishment against provisional or prophylactic legal malpractice cases." *Id.* ¶ 29. Those "cases all have the common thread that the attorney's negligence could not have reasonably been discovered before the trial court entered an adverse judgment." *Id.* Conversely, the court found that an adverse judgment was unnecessary for discovering the negligence "because the negligence was obvious *** when substitute counsel discovered the defect in the lien and began researching and developing alternative theories regarding its unperfected mechanic's lien." *Id.* ¶ 27.

¶ 32    We agree with the holdings in *FagelHaber* and *Nelson*, but neither applies here. In both cases, the clients were the plaintiffs in the underlying suits, and their injuries were established before a judgment in the underlying suit. Hence, the clients knew when they retained new counsel and began paying attorney's fees that they had likely been injured by the attorney's negligence. Conversely, as in *Lucey* and *Warnock*, Barus, as the defendant in the underlying lawsuit, could not have known he had been injured until entry of the judgment against him. As noted, had Barus prevailed in the underlying lawsuit and the trial court found that he did not breach his fiduciary duties by following Carlson's legal advice, he would have no claim for legal malpractice against Carlson. So, filing a complaint before the judgment would have been premature and pointless.

¶ 33    The judge's comments before trial in the underlying case that a legal malpractice claim against Carlson was "a hundred percent" certainty are misplaced. As noted, with limited exceptions not relevant here, a plaintiff does not sustain an injury until suffering an adverse judgment, settlement, or dismissal in the underlying action. *Nelson*, 2016 IL App (1st) 160571, ¶ 13. The judge's comments may have been made for any number of reasons, and they do not and cannot substitute for adverse judgment, settlement, or dismissal.

¶ 34    The dissent contends Barus suffered an adverse disposition triggering the statute of limitation when the trial court entered a temporary restraining order (TRO) in the underlying lawsuit. Not so. A TRO preserves the status quo until the case can be decided on its merits. *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.*, 94 Ill. 2d 535, 542 (1983). The TRO prohibited Barus from denying ROC access to company documents and information and from taking steps to further dissolve the company. It does not constitute a judgment adverse to Barus, as it merely required him to maintain the company's status quo while the case was pending.

Further, a party may later seek to modify a TRO for any number of reasons, and nothing either indicates or suggests that the trial court or any party considered the TRO as an adverse ruling.

¶ 35    Also without basis is the dissent's contention that the trial court order dissolving the company was an adverse judgment. Indeed, Barus wanted to dissolve the company and, as noted, took steps to unwind the business relationship with ROC. Again, only the trial court's June 2015 finding that Barus breached his fiduciary duties to ROC in trying to dissolve the company constitutes an adverse judgment.

¶ 36    The dissent then asserts that Barus's claim accrued when he incurred attorney's fees in defending against ROC claims. Usually, defendants in a lawsuit pay an attorney to represent their interests, which is exactly what Barus did here. Not until the trial court found he had breached his fiduciary duties did Barus have knowledge that he had been injured by Carlson's legal advice, and filing a legal malpractice lawsuit before then would have been premature. Under the dissent's theory, whenever a legal client follows an attorney's advice and is later sued, the client would need to sue the attorney within two years to preserve his or her malpractice claim, likely long before the outcome of the underlying lawsuit is known and regardless of whether the client believes he or she will prevail in the underlying suit. Not only is this not the law, but it also would unnecessarily place lawyers in an untenable position whenever a client is sued as a result of legal advice.

¶ 37    The statute of limitations on Barus's legal malpractice claim began to accrue when the trial court in the underlying case entered judgment against him, June 17, 2015. He timely filed his complaint less than a year later, May 26, 2016.

¶ 38    Carlson alternatively argues that regardless of the statute of limitations, we should affirm the summary judgment order because the damages Barus was ordered to pay, namely, 50% of the fair value of the assets Barus improperly transferred to his own company, constituted a pre-existing

legal obligation under the ROC/Suburban operating agreement, unrelated to Carlson's legal advice. In other words, Carlson asserts Barus suffered no damages because he would have been required to compensate ROC for its 50% share of the ROC/Suburban assets regardless of any purported attorney malpractice. We disagree. Under the operating agreement, Barus could have ceased using ROC/Suburban at any time. And, as the trial court in the underlying case noted, had Barus disassociated properly under the agreement, ROC/Suburban would have no recourse. Instead, Barus improperly took ROC/Suburban's employees in June 2010, before the vendor relationship terminated on July 1, 2010, and his failure to act properly was a decisive factor in the court's damages award. The court calculated damages as 50% of the assets Barus took, which included the full value of the contracts, an amount Barus had to pay due to his breach of his fiduciary duties.

¶ 39    We reverse the trial court's summary judgment order and remand for further proceedings.

¶ 40    Reversed and remanded.

**No. 1-19-1953**

| | |
|---|---|
| **Cite as:** | *Suburban Real Estate Services, Inc. v. Carlson*, 2020 IL App (1st) 191953 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-5295; the Hon. Diane M. Shelley, Judge, presiding. |
| **Attorneys for Appellant:** | John W. Moynihan, of Downers Grove, for appellants Suburban Real Estate Services, Inc. and Bryan E. Barus. |
| **Attorneys for Appellee:** | John J. D'Attomo, of Nisen & Elliott, LLC, of Chicago, for appellees William Roger Carlson Jr. and Carlson Partners, Ltd. <br><br> Rebecca M. Rothmann, of Wilson Elser Moskowitz Edelman & Dicker LLP, of Chicago, for other appellees. |