(No. 70410

JACKSON JORDAN, INC., Appellant, v. LEYDIG, VOIT & MAYER, Appellee.

*Opinion filed January 20, 1994.—Rehearing denied April 4, 1994.*

242

BILANDIC, C.J., took no part.

MILLER, J., dissenting.

Michael T. Hannafan, Michael B. Dedio and William E. Blais, of Michael T. Hannafan & Associates, Ltd., and Paul P. Biebel, Jr., and Thomas A. Reynolds, Jr., of Winston & Strawn, all of Chicago, for appellant.

James T. Ferrini, Gary Kostow, Douglas J. Palandech, Suanne P. Hirschhaut and Sonia V. Odarczenko, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, for appellee.

Barry A. Miller, Malcolm C. Rich and Elizabeth M. Streit, of Chicago, for *amicus curiae* Chicago Council of Lawyers.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiff, Jackson Jordan, Inc., brought the present action in the circuit court of Cook County against its former attorneys, the law firm of Leydig, Voit & Mayer. The plaintiff sought to recover damages for legal malpractice allegedly committed by the defendant in the course of advising the plaintiff on a matter of patent law. The circuit court granted the defendant's motion for summary judgment on the ground that the action was barred by the five-year limitations period applicable to legal malpractice claims. The appellate court affirmed. (199 Ill. App. 3d 728.) We allowed the plaintiff's petition for leave to appeal (134 Ill. 2d R. 315(a)), and we now reverse the circuit and appellate courts.

The procedural background of this case is not in dispute. Jackson Jordan, Inc. (Jackson), manufactures and sells railroad track maintenance equipment. In 1973, Jackson asked its patent attorneys, the Chicago law firm of Leydig, Voit & Mayer (Leydig), whether a new track maintenance machine Jackson was planning to build and market, the Model 6000, would infringe on any existing patents. Jackson sent its attorneys diagrams and other information concerning the planned machine. Following an examination of the machine's design and a review of relevant patents on devices of that type, Leydig concluded that the Model 6000 would not infringe on any unexpired patents. In a letter to Jackson dated May 23, 1973, one of the Leydig firm's attorneys wrote:

> "We have also reviewed the prior art patents in our file for possible infringement by a machine of the basic design you have proposed. We did not find any unexpired patents that would present any infringement problems."

Following the receipt of counsel's letter, Jackson proceeded with its plans to manufacture and market the Model 6000 machine. In later years, Jackson also

produced and marketed related machines—the Model 6500 and the Model 7000—that incorporated the same basic design used in the Model 6000.

In preparing the opinion letter of May 23, 1973, the Leydig firm allegedly failed to examine the patent that is the focus of the present action. On February 10, 1970, the United States Patent Office had issued patent No. 3,494,297 (the '297 patent or Plasser patent) for a railroad track maintenance machine to Franz Plasser and Josef Theurer, who had then assigned the patent to Plasser American Corporation. Although Leydig had sent Jackson a copy of this particular patent in April 1970 as part of the law firm's regular practice of relaying to its client pertinent patents in this field, Leydig did not refer to the '297 patent in its letter of May 23, 1973. The patent expired in February 1987.

In 1975, Plasser American brought a patent infringement suit against Canron, Inc., another competitor in the railroad track maintenance equipment industry. At some point, Jackson executives learned of the Plasser-Canron litigation, though the extent of their knowledge is not clear from the record and is in dispute. On April 23, 1980, the district court ruled in favor of Plasser in its suit against Canron, finding that Canron had infringed Plasser's '297 patent as well as another Plasser patent not relevant here. (*Plasser American Corp. v. Canron, Inc.* (D.S.C. 1980), 546 F. Supp. 589.) Plasser and Canron later settled the case while the matter was pending in the court of appeals. On July 15, 1980, following an inquiry by a Jackson executive, Leydig sent Jackson a letter reporting the district court's decision in the Plasser-Canron litigation. Jackson later asked the firm to evaluate the possible impact of that litigation on its own track maintenance machines. Leydig responded in a letter dated August 26, 1980, reviewing at length the course of the Plasser-Canron litigation. In the

August letter, a Leydig attorney assured Jackson that the Plasser patent was invalid and, in addition, outlined two defenses Jackson could assert against an infringement claim by Plasser: *laches* and estoppel. Leydig's letter concluded:

> "To summarize, we believe Jackson has a sound defense of laches and estoppel to assertion of the Plasser patents. *** In our opinion, the '297 patent should be held invalid if litigated outside of the Fourth Circuit. We recommend that Jackson decide now to sue Plasser if a customer is sued in the Fourth Circuit or it otherwise appears that Jackson could be brought before the Courts of the Fourth Circuit. Finally, we believe that there is a 50-50 chance that the problem will disappear through the Court of Appeals reversing [the district court judge in the Plasser-Canron case]."

On June 28, 1982, a Plasser executive wrote to Jackson's executive vice-president, J.H. Bush, contending that Jackson's track maintenance machines infringed on Plasser's '297 patent. Plasser's letter stated that the patent holder would sue Jackson for infringement if the parties could not amicably settle the matter. Jackson then sought Leydig's advice concerning the matter. According to a supplemental affidavit submitted by Jackson's president, Daniel Donahue, a Leydig attorney orally assured him that the company was not infringing on any valid patents and again advised that Jackson bring a declaratory judgment action against the patent holder.

Acting on Leydig's recommendation, on July 19, 1982, Jackson filed suit against Plasser in the United States District Court for the District of Delaware, seeking a declaratory judgment of its rights concerning the validity of the '297 patent; Leydig represented Jackson in those proceedings. Plasser filed a counterclaim, alleging Jackson's infringement of the '297 patent. The action was later transferred to the United States District Court for the Eastern District of Vir-

ginia, Norfolk Division. The district court severed the damages issue and, following a bench trial, ruled in Jackson's favor on several portions of its complaint on August 8, 1983. Addressing the parties' various claims for relief, the district court held that the equitable doctrine of *laches* would bar Plasser from obtaining damages for alleged infringement occurring prior to the commencement of the action. The court rejected Jackson's further argument, however, that Plasser was estopped from recovering any damages, whenever they were incurred, for the alleged infringement. With respect to the merits of Plasser's infringement claim, the district court determined that the relevant portions of the '297 patent were invalid. Finally, the court found that Plasser had not committed intentional fraud in prosecuting its patent application, and the court thus dismissed an antitrust claim Jackson was also asserting. *Jackson Jordan, Inc. v. Plasser American Corp.* (E.D. Va. 1983), 219 U.S.P.Q. 922.

In a letter dated October 6, 1983, a Leydig attorney wrote to Jackson concerning the estimated time and expense that would be involved in Plasser's appeal from the district court judgment. The letter writer also assured Jackson that the favorable portions of the district court's decision would be upheld on appeal. The letter stated, in pertinent part, "[i]t is our belief that the decision in favor of Jackson will be affirmed and hence no additional liability is foreseen."

Leydig's assessment proved to be incorrect, however. On November 9, 1984, the Court of Appeals for the Federal Circuit vacated that portion of the district court judgment finding Plasser's '297 patent to be invalid, affirmed the other portions of the district court judgment, and remanded the matter to the district court for further proceedings. *Jackson Jordan, Inc. v. Plasser American Corp.* (Fed. Cir. 1984), 747 F.2d 1567.

On February 27, 1986, the district court rejected Jackson's challenges to the validity of the Plasser patent and ruled that a number of Jackson's models infringed on the patent. (*Jackson Jordan, Inc. v. Plasser American Corp.* (E.D. Va. 1986), No. 82—825—N.) The court of appeals affirmed that judgment on April 23, 1987, in an unpublished order. (*Jackson Jordan, Inc. v. Plasser American Corp.* (Fed. Cir. 1987), 824 F.2d 977 (table).) The only issue remaining to be resolved was the amount of Plasser's damages. On September 16, 1987, Jackson invited the Leydig firm to take part in settlement negotiations with Plasser and, at the same time, advised Leydig of its intention to sue the law firm for malpractice. Leydig declined to participate in the negotiations, however, and withdrew as Jackson's counsel. Jackson and Plasser settled the patent infringement dispute on September 22, 1987, with Jackson agreeing to pay $1.9 million in damages to the patent holder.

Jackson filed the present action in the circuit court of Cook County on February 1, 1988. In its complaint, Jackson alleged that Leydig negligently failed to examine and review the '297 patent in 1970, when it was issued, and in 1973, when Jackson requested the opinion regarding its new Model 6000 machine, and negligently failed to advise Jackson that its machines might infringe on the Plasser patent. Jackson requested as damages $1.9 million, representing the amount of its 1987 settlement with Plasser, together with $350,000, the approximate sum of the legal fees it had incurred in the course of the patent litigation with Plasser.

In its answer to the complaint, Leydig denied Jackson's allegations of negligence and raised the statute of limitations as an affirmative defense. Leydig contended that the plaintiff's action was barred by the five-year limitations period provided by section 13—205 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110,

par. 13—205). Leydig later moved for summary judgment on the statute of limitations issue. In support of its motion, Leydig contended that the plaintiff's cause of action accrued no later than June 28, 1982, when Plasser sent Jackson notice of its intention to bring a patent infringement claim, and that the action could have accrued as early as May 1973, when the patent clearance letter was sent. Leydig thus contended that Jackson's malpractice claim was time-barred because it was not brought until February 1988, more than five years after the latest possible date of accrual. The parties submitted affidavits and depositions in support of their respective positions.

Following a hearing, the circuit judge granted Leydig's motion for summary judgment and dismissed the action with prejudice. The judge agreed with Leydig that the applicable limitations period began to run no later than June 18, 1982, the date of the letter in which Plasser announced its intention to pursue a patent infringement claim against Jackson. The circuit judge concluded that Jackson, by that time, knew or should have known of its injury and should have inquired whether the injury was wrongfully caused.

Jackson appealed, and the appellate court affirmed. (199 Ill. App. 3d 728.) Like the trial judge, the appellate court believed that Jackson started to incur injury, and damages, no later than June 1982, when the company began paying the Leydig firm fees in connection with Plasser's impending infringement claim. The appellate court concluded that Jackson knew or should have known of its injury, and of the injury's wrongful cause, once it received Plasser's letter announcing the patent holder's intention to sue. Finally, the appellate court believed that Jackson had waived its further contentions that Leydig's repeated assurances of success in litigation against Plasser estopped the law firm from raising

the limitations bar. We allowed Jackson's petition for leave to appeal (134 Ill. 2d R. 315(a)). We now reverse the judgments of the lower courts.

## SUMMARY JUDGMENT

A motion for summary judgment is to be granted if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) The pleadings, depositions, admissions, and affidavits on file must be construed against the movant and in favor of the opponent of the motion, although the opponent cannot rely simply on his complaint or answer to raise an issue of fact when the movant has supplied facts which, if not contradicted, entitle him to judgment as a matter of law. (*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 294.) Summary judgment is a drastic means of disposing of litigation, so the right of the moving party to obtain summary judgment must be clear and free of doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Where doubt exists as to the right of summary judgment, the wiser judicial policy is to permit resolution of the dispute by a trial. *Armagast v. Medici Gallery & Coffee House, Inc.* (1977), 47 Ill. App. 3d 892, 896.

There is no dispute between the parties that the statute of limitations applicable to this case is five years (Ill. Rev. Stat. 1989, ch. 110, par. 13—205), and that the discovery rule may be applied in this case. The discovery rule delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused. *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 415; *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171; *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156.

The time at which a party has or should have the requisite knowledge under the discovery rule to maintain a cause of action is ordinarily a question of fact. (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 154.) Thus, summary judgment in this case would be appropriate only if the undisputed facts allow for only one conclusion: that more than five years elapsed between the time which Jackson knew or should have known of its injury and February 1, 1988, the date Jackson filed its complaint.

Guidance as to the proper disposition in this case can be found in *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161. In *Nolan*, the plaintiff's decedent filed a strict liability lawsuit in 1975 against a manufacturer who distributed asbestos. The plaintiff knew he had lung problems in 1957, and that he had pulmonary fibrosis in 1965. However, he was not told by a doctor that he had asbestosis, and that his condition was caused by exposure to asbestos materials at his work, until 1973. If discovery of his injury did not occur until this time, his suit would have been within the two-year statute of limitations for personal injuries. This court held that the time of discovery should remain a jury question. "The evidence is conflicting as to whether or when [decedent] would have had sufficient information to reach such a conclusion earlier [than 1973]. The resolution of this question is not the province of this court. It is a question of fact, and in this case, a seriously disputed one. Accordingly, summary judgment, which requires that no genuine issues of material fact exist [citation], is not the appropriate remedy here." *Nolan*, 85 Ill. 2d at 171-72.

As in *Nolan,* there are several points in time when plaintiff in the instant case might have had sufficient information to conclude that its attorneys were negligent. It could have been as early as 1975, when Plasser brought its original suit against Canron. It could have

been on June 28, 1982, the date of the letter in which Plasser announced its intention to sue Jackson. Knowledge on either of these dates would preclude this cause, as the limitations period would have run. However, Jackson might not have known of its injury until November 9, 1984, the date the Federal appeals court rendered the first ruling adverse to Jackson; if this were determined to be correct, Jackson's complaint was· timely filed. Since the facts could support more than one conclusion, it was error to enter summary judgment. We therefore reverse the trial court's entry of summary judgment and remand the cause for a trial on the merits.

## EQUITABLE ESTOPPEL

Jackson also argues that Leydig should be equitably estopped from asserting the statute of limitations defense because the delay was induced by Leydig's actions. The appellate court refused to consider this argument, finding it waived. However, this court is not precluded from considering issues not properly preserved by the parties, and indeed has "the responsibility *** for a just result and for the maintenance of a sound and uniform body of precedent [that] may sometimes override the considerations of waiver that stem from the adversary character of our system." (*Hux v. Raben* (1967), 38 Ill. 2d 223, 225.) We believe the instant case to be one which requires such *sua sponte* consideration.

The facts of this case are remarkably similar to those in *Witherell v. Weimer* (1981), 85 Ill. 2d 146. In *Witherell*, plaintiff was a woman who began suffering pain in her leg shortly after she began taking birth control pills in 1966. Her condition quickly deteriorated to the point where she could not walk. Several friends and relatives told her that birth control pills cause blood clots. When she asked her doctor about this, he laughed and said that the pain was caused by a muscle condition which would not be cured. She did not seek a second opinion

until 1976, at which time the blood clots were discovered. That was also the earliest time she took any action remotely resembling a lawsuit, by sending a letter of complaint about her doctors.

This court held that the statute of limitations barred a suit against the birth control manufacturer, finding that a jury could only conclude that plaintiff knew or should have known of her injury for more than two years. However, it estopped the plaintiff's doctors from so arguing. "Had it not been for the alleged constant reassurance" by the doctors that nothing was medically wrong, plaintiff's suit would not have been delayed as long as it was. (*Witherell*, 85 Ill. 2d at 158.) Likewise, in this case had it not been for defendant's constant reassurances that no patent was infringed upon and that Plasser's claim was without merit, plaintiff's suit would not have been so delayed. " '[I]t is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay. [Citations.] Rather, all that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit.' " *Witherell*, 85 Ill. 2d at 159, quoting *Bomba v. W.L. Belvidere, Inc.* (7th Cir. 1978), 579 F.2d 1067, 1071.

In ruling that the doctors were equitably estopped from pressing their statute of limitations claim, the court in *Witherell* relied on the great deal of trust and confidence that a patient normally places in his doctor, and that a doctor's recommendations are often accepted without question. These considerations counsel an equal readiness to apply the doctrine of equitable estoppel to delay caused by a lawyer's advice.

The law firm in this case was hired for its advice. The advice was given and the client relied on it, allegedly to its ultimate detriment. Throughout the proceed-

ings, however, the client was reassured as to the soundness of its legal position. The mere assertion of a contrary claim and the filing of a lawsuit were not, in and of themselves, sufficiently compelling to induce the client to seek a second legal opinion. Meritless claims and nuisance lawsuits are, after all, a fairly commonplace occurrence. It would be a strange rule if every client were required to seek a second legal opinion whenever it found itself threatened with a lawsuit. Moreover, in the case at hand, the client was lulled into a false sense of security by the firm's soothing reassurances and advice.

CONCLUSION

Because a reasonable jury could conclude that Jackson did not discover its injury until November 9, 1984, which was within five years of the commencement of this lawsuit, summary judgment was inappropriately awarded. Further, because the delay in seeking other legal counsel and filing the instant complaint was a direct result of Leydig's advice, Leydig is equitably estopped from asserting the defense that the statute of limitations had expired prior to the commencement of this lawsuit. Accordingly, the entry of summary judgment by the circuit court is reversed, as is the appellate court's affirmance of that decision. This cause is remanded for further proceedings.

*Appellate court reversed;*
*circuit court reversed;*
*cause remanded.*

CHIEF JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE MILLER, dissenting:

I do not agree with the majority's decision to reverse the judgments of the courts below. In my view, the

circuit judge correctly determined that the present action for legal malpractice was untimely. In addition, I do not believe that the defendant is estopped from raising the statute of limitations as a bar to the plaintiff's action. For these reasons, I would hold that the plaintiff's suit is time-barred.

Reversing the judgments of the circuit and appellate courts, as well as a previous opinion of this court (*Jackson Jordan, Inc. v. Leydig, Voit & Mayer* (December 4, 1992), No. 70410), the majority concludes, with virtually no analysis, that the present case raises a triable question of fact regarding the time at which the plaintiff-client should have discovered its cause of action. In reaching this result, the majority relies primarily on *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161. Although *Nolan* states the applicable law, the facts in *Nolan* are far different from the facts of the present case. *Nolan* involved the application of the discovery rule to a gradually developing medical condition allegedly caused by the injured person's workplace exposure to asbestos. The court concluded that the discovery issue in that case was properly resolved as a question of fact. In contrast to *Nolan*, the present case reveals that the plaintiff's executive officers had ample reason by 1982 to consider whether the plaintiff had sustained an injury as a consequence of the defendant's representations in its 1973 patent clearance letter. The present suit, filed in 1988, must therefore be judged untimely under the five-year limitations period applicable here.

Under the discovery rule, a cause of action accrues when the party knows or reasonably should know that he has been injured and that his injury was wrongfully caused. (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 415; *Nolan*, 85 Ill. 2d at 171; *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156.) The circuit judge in the present case, after extensive consideration, granted Leydig's

motion for summary judgment on the statute of limitations issue. I believe that the circumstances in this case allow but one conclusion with regard to the discovery question, and that the circuit judge properly determined, as a matter of law, that Jackson's claim for legal malpractice could have accrued no later than June 28, 1982, when Plasser made clear its intention to pursue a patent infringement suit against Jackson.

In 1980 the results of the litigation between Plasser and Canron, Inc., were explained to Jackson executives, who then knew that Plasser's patent was valid and that a Canron product similar to Jackson's own machines had been found to infringe on the patent. The affidavits and depositions submitted to the circuit court show that Jackson's president, Daniel Donahue, and one of the company's other senior executives, James Anderson, knew or should have known that the company faced a patent infringement problem. Both executives were concerned in 1980 that Plasser might try to sue Jackson, as it had Canron, and understood that the Canron machines found to have infringed on the Plasser patent were similar to Jackson's own machines.

Daniel Donahue acknowledged in his deposition that the company was concerned as early as 1980 that it might become involved in litigation with Plasser, which would place at risk the company's large investment in its new machines. One of Leydig's partners wrote to Jackson in August 1980, warning that Plasser, if it prevailed against Canron, might choose next to "roll the dice" against Jackson. Donahue addressed the company's concerns in his deposition:

"Q. What did you understand Mr. Mayer to mean by roll the dice?

A. We could be sued.

Q. This advice of potential litigation against your company caused you concern in 1980, did it not, sir?

A. Certainly.

Q. You were concerned, were you not, because your company had invested substantial sums of money in the production of its Model 6000, 6500 and 7000; isn't that true?

A. It had built a business around these machines, yes.

Q. And you were likewise concerned because your company had spent substantial sums of money in the acquisition and fitting of the Baxter Springs[,] Kansas[,] facility?

A. That was part of the investment, yes."

James Anderson, in his deposition, voiced similar concerns. Asked whether his company was worried in 1980 about the implications of the Plasser-Canron litigation on Jackson, Anderson replied in the affirmative. He explained that the reason for the concern was "[t]hat we might have infringed on that same patent." Anderson understood also that his company's machines were similar to the devices involved in the other litigation:

"Q. You believe that [the Leydig firm's] May 23, 1973[,] letter was a non-infringement opinion, correct?

A. Correct, yes.

Q. As it related to your proposed Model 6000 machine, correct?

A. Correct.

\* \* \*

Q. And you knew that there were substantial similarities between the Canron Mark 3 and your Model 6000, correct, in 1980?

A. Correct."

In 1980, the Jackson executives should have realized that the company faced a patent infringement problem, contrary to Leydig's 1973 patent clearance letter, which had assured Jackson that its new machines would face no patent infringement problems, and which had failed to mention Plasser's patent at all. The Jackson executives' concerns were simply borne out two years later, in June 1982, when Plasser sent Jackson the letter asserting the patent holder's rights and warning Jackson of the infringement claim. Plasser's threatened

action was not merely a nuisance suit, but one by the holder of a valid patent that Leydig had failed to disclose in its 1973 letter. The Jackson executives knew that Plasser had prevailed in its earlier action against Canron and that the Canron track maintenance machine found to have infringed on the Plasser patent was similar to Jackson's own devices.

By 1980, and certainly by 1982, no reasonable person could have failed to realize the error in Leydig's assurance that Jackson would face no patent infringement problems. I would conclude, as did the courts below, that the point of discovery in this case was reached no later than June 1982, when Plasser directly notified Jackson of the patent holder's impending claim. It was not necessary for maintenance of its malpractice action that Jackson have known exactly in what way the Leydig firm had been negligent. For purposes of the discovery rule, it does not matter whether Leydig had located the patent but misanalyzed it, or whether the firm had failed to consider the patent at all. It was only necessary that Jackson have realized that it was facing an infringement problem as a result of its manufacture of the machines; on this record, it is clear that Jackson was in possession of that knowledge as early as 1980, and surely by 1982.

Indeed, Jackson acknowledges that it filed the present action before any of its executives actually knew that the law firm had failed to examine the Plasser patent in 1973. Under the discovery rule, of course, a statute of limitations may begin to run even though the plaintiff lacks actual knowledge of the precise manner in which the defendant was negligent. As *Nolan* explained, "[I]f knowledge of negligent conduct were the standard, a party could wait to bring an action far beyond a reasonable time when sufficient notice has been received of a possible invasion of one's legally protected

interests." (*Nolan*, 85 Ill. 2d at 170-71.) Such a result also would be "contrary to the underlying purpose of statutes of limitations, which is to 'require the prosecution of a right of action within a reasonable time to prevent the loss or impairment of available evidence and to discourage delay in the bringing of claims.' [Citations.]" *Nolan*, 85 Ill. 2d at 171.

I am aware, of course, of considerations generally relevant to the attorney-client relationship that might counsel in favor of later discovery of a cause of action for legal malpractice. The relationship is a fiduciary one, and a client is entitled to repose trust and confidence in the attorney's work. The time at which trust and confidence appropriately turn to doubt cannot be defined with precision, and that determination will necessarily depend on the circumstances of the particular case. The circuit judge in the proceedings below was certainly sensitive to this issue. The judge believed, however, that the five-year limitations period was sufficiently lengthy to accommodate these concerns. The judge stated:

> "That's why the courts have said five years for legal malpractice, five years for accountant's malpractice, because it's a tort. It's not a contract claim. We give you five years. That gives you five years to fight it out over here and then you can sue. But you've got to do it within five years."

The circuit judge correctly believed that in the present case the time for discovery could have occurred no later than June 1982, when Plasser formally advised Jackson of the patent holder's intention to file suit.

I must also disagree with the majority's further conclusion that Leydig is now equitably estopped from asserting the statute of limitations defense. Leydig is "estopped from asserting the limitations bar if the plaintiff's failure to act within the statutory period results from reasonable reliance on the defendant's

conduct or representations." (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 330; see *Dill v. Widman* (1952), 413 Ill. 448, 455-56.) The conduct and representations cited by Jackson in support of this contention are Leydig's statements regarding the strength of Plasser's claim of infringement and possible defenses to that claim. Jackson points to the law firm's assurances, made in the wake of the Plasser-Canron litigation and later, during the early stages of Jackson's own declaratory judgment action against Plasser, that Jackson would prevail. Jackson notes that the law firm questioned the soundness of the Plasser-Canron decision, mentioned possible defenses the client might assert, and insisted that the Plasser patent was actually invalid.

The negligence alleged in the present case involves the Leydig firm's failure, in 1973, to call to Jackson's attention the existence of Plasser's patent and advise the company that its own machines, if not redesigned, might face a possible patent infringement claim by the patent holder. Thus, the statements cited by the plaintiff should not have induced the client to forgo its malpractice claim against its attorneys for the error of their earlier opinion. Leydig's statements could only have confirmed Jackson's realization that the company faced an infringement problem, and one that was no less real for perhaps being remediable.

For the reasons stated, I agree with the courts below that Jackson should have discovered its potential cause of action against Leydig no later than June 1982, when the company received Plasser's letter asserting its patent rights. In addition, I do not believe that Leydig is equitably estopped from asserting the statute of limitations defense. I would conclude, as did the circuit and appellate courts, that the present action, brought more than five years after June 1982, must be considered untimely under the applicable statute of limitations.