2021 IL App (1st) 200414-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
March 16, 2021

No. 1-20-0414

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| TERRANCE ROSENBERGER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 L 4484 |
| | ) | |
| MELTZER, PURTILL & STEELE LLC, and JOHN PURTILL, | ) | The Honorable |
| | ) | Diane M. Shelley, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court did not abuse its discretion by denying motion to set briefing schedule first presented at summary judgment hearing or by granting only seven days to file counter-affidavit. Plaintiff provided no basis for determining that trial court abused its discretion in denying motion to reconsider summary judgment order. Plaintiff's legal malpractice action involving employment agreement was untimely where it was filed over two years after plaintiff sued employer for breach of same agreement.

¶ 2    The plaintiff, Terrance Rosenberger, appeals the trial court's entry of summary judgment in favor of the defendants, Meltzer, Purtill & Steelle, LLC, and John Purtill, on the grounds that his action against them for legal malpractice was untimely, as well as the trial court's denial of his

motion to reconsider that order. We affirm the judgment of the trial court.

¶ 3                                        I. BACKGROUND

¶ 4        This case is a refiling of a legal malpractice action that was originally filed on August 31, 2016, under docket number 16 L 8676. It involves the alleged professional negligence by the defendants in representing the plaintiff in the negotiation of an employment agreement that included a provision concerning regulatory approval of any severance payments, which was also the subject of this court's decision in *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102. In that decision, the court set forth some of the salient background facts giving rise to the provision of the employment agreement at issue in this case:

    "UCB [(United Community Bancshares, Inc.)], successor by merger to Commercial Bancshares Corporation, is a bank holding company and CenTrust Bank, N.A. (CenTrust) is a wholly owned subsidiary of UCB that operates a community bank in Northbrook, Illinois. As a member of the Federal Deposit Insurance Corporation (FDIC), CenTrust is subject to FDIC regulations.

    Prior to the events at issue here, in 2011, Rosenberger and James McMahon became interested in investing in a community bank after the bank they previously worked at, Park National Bank, failed. Rosenberger and McMahon, along with a third individual, Gerard Buccino, formed a company, United Financial Holdings Group, Inc. (United Financial), for the purpose of raising capital and acquiring a majority interest in a troubled community bank in the Chicago area.

    Rosenberger and McMahon identified CenTrust as a candidate for acquisition. According to a 'Strategic Plan,' CenTrust was founded in 2006 and, by 2008, losses quickly emerged as a result of a 'global liquidity crisis' that impacted the United States and local

economies. Due to the declining value of commercial real estate, CenTrust experienced losses, which required additional capital to be committed to its loan-loss reserves. At some point, the Office of the Comptroller of the Currency (OCC) entered into an 'Operating Agreement' with CenTrust, subjecting it to heightened regulatory oversight.

In January 2012, after months of planning and negotiating with UCB and federal regulators, United Financial entered into a Stock Purchase Agreement with UCB, whereby CenTrust would receive $7 million in new capital and Rosenberger, McMahon, and Buccino would be hired as CenTrust's new management team. The $7 million in new capital improved CenTrust's capital reserves above the minimum 'Tier 1' regulatory levels.

On February 1, 2012, UCB hired Rosenberger to serve as CenTrust's chief lending officer. His Employment Agreement provided an initial term of three years with a base salary of $200,000 per year, subject to annual increases in 'an amount not less than the increase to the Consumer Price Index for the prior twelve months[.]' Rosenberger's compensation package also included a car allowance, reimbursement of country club and athletic club dues, a 401(k) plan, and discretionary bonuses. Relevant here, section 4(e) of the Employment Agreement entitled Rosenberger to severance benefits:

'(e) Severance Compensation. If this Agreement is terminated by the Company prior to the expiration of the Employment Period for any reason other than Cause, *** then the Employee shall be entitled to receive in a single payment *** an amount equal to two times his annual base salary then in effect.' " *Id.* ¶¶ 3-7.

¶ 5 Although a termination without cause entitled the plaintiff to a lump sum severance payment, the employment agreement also included section 28, which provided as follows:

"28. Regulatory Suspension and Termination.

(a)    If Executive is suspended from office and/or temporarily prohibited from participating in the conduct of the affairs of Employer by a notice served under Section 8(e)(3) (12 U.S.C. § 18l8(e)(3)) or 8(g) (12 U.S.C. § 1818(g)) of the FDIA [(Federal Deposit Insurance Act)], Employer's obligations under this Agreement shall be suspended as of the date of service, unless stayed by appropriate proceedings. If the charges in the notice are dismissed, Employer may in its discretion: (i) pay Executive all or part of the compensation withheld while the contract obligations were suspended; and (ii) reinstate (in whole or in part) any of the obligations which were suspended.

(b)    If Executive is removed and/or permanently prohibited from participating in the conduct of the affairs of Employer by an order issued under Section 8(e) (12 U.S.C. § 1818(e)) or 8(g) (12 U.S.C. § 1818(g)) of the FDIA, all obligations of Employer under this Agreement shall terminate as of the effective date of the order, but vested rights of the contracting parties shall not be affected.

(c)    If Employer is in default as defined in Section 3(x) (12 U.S.C. § I8l8(x)(l)) of the FDIA, all obligations of Employer under this Agreement shall terminate as of the date of default, but this subsection shall not affect any vested rights of the contracting parties.

(d)    All obligations of Employer under this Agreement shall be terminated, except to the extent it is determined by the Federal Deposit Insurance Corporation (the 'FDIC') that continuation of the Agreement is necessary for the continued operation of the institution, at the time the FDIC enters into an agreement to provide assistance to or on behalf of Employer under the authority contained in Section 13(c) (12 U.S.C. § 1823(c)) of the FDIA, or when Employer is determined by the FDIC to be in an unsafe or unsound

condition. Any rights of the parties that have already vested, however, shall not be affected by such action.

(e)        Any payments made to Executive pursuant to this Agreement, or otherwise, are subject to and conditioned upon their compliance with Section 18(k) (12 U.S.C. § I828(k)) of the FDIA."

¶ 6        According to the complaint for legal malpractice, the defendants represented the plaintiff in the negotiation of his employment agreement with UCB. The plaintiff alleges that the severance provision was an "essential feature" to him because he was investing a substantial sum and needed a financial cushion if he lost his salary. The initial draft of his employment agreement had no provision requiring regulatory approval of any severance payment. However, during negotiations, the defendants added a section pertaining to various regulatory provisions that they "assume[d] that the regulators may expect to see." Thus, the final version of the plaintiff's employment agreement, dated February 1, 2012, included section 28, as set forth in the preceding paragraph. In general, the complaint alleges that the defendants were professionally negligent in failing to obtain the plaintiff's consent or explain to him the legal significance of the inclusion of section 28, which was to require that any severance payment to which he was otherwise entitled upon termination necessitated the approval of bank regulators. It also alleges they were negligent in failing to attempt to obtain regulatory approval for severance payments prior to advising the plaintiff to enter into the employment agreement, and that they operated under a conflict of interest.

¶ 7        On November 5, 2013, the plaintiff's employment agreement was terminated by UCB, which refused to make any severance payment to him under the employment agreement. At that time, Michael J. Condron was an attorney for CenTrust. According to an affidavit by Condron in the summary judgment record, he received a phone call on November 8, 2013, from attorney Edward

Fitzpatrick, who stated to him that he was representing the plaintiff and made a request for his personnel records. Condron's affidavit stated that on November 15, 2013, he met with Fitzpatrick to deliver the documents, and they discussed the plaintiff's claim that he was entitled to a severance payment under his employment agreement. Condon's affidavit stated that he and Fitzpatrick discussed that the plaintiff "was in a no-win situation with his severance claim because: (1) he was terminated for cause and not entitled to severance, and (2) even if he was not terminated for cause, the Office of the Comptroller of the Currency would not likely give regulatory approval for a severance payment as required by [the plaintiff's] employment agreement."

¶ 8    On March 7, 2014, the plaintiff filed the lawsuit against UCB for breach of contract that was the subject of this court's previous decision. In that case, he alleged that UCB had breached the terms of the employment agreement by, among other things, failing to pay him severance compensation owed under the terms of the employment agreement. The plaintiff was not represented in this lawsuit by Fitzpatrick, but instead he was represented by attorneys from the law firm of Adducci, Dorf, Lehner, Mitchell & Blankenship, P.C. (Adducci law firm).

¶ 9    On September 5, 2014, UCB filed its answer and affirmative defenses in that case. As alleged in the instant complaint for legal malpractice, that answer by UCB raised a number of affirmative defenses, one of which was that any "severance payments were barred by the FDIA and Section 28 of the employment agreement." The instant complaint for legal malpractice further alleges that it was when the plaintiff received UCB's answer raising this affirmative defense that he first discovered that the severance payments in his employment agreement were conditioned upon these regulatory approvals and requirements.

¶ 10    Only a few of the pleadings from the earlier-filed legal malpractice action (16 L 8676) are included in the record on appeal. However, it appears that after the plaintiff filed his complaint for

legal malpractice on August 31, 2016, the defendants filed a motion to dismiss in which they raised the defense that the two-year statute of limitations had expired prior to that date. It appears that the plaintiff then responded to this motion on January 12, 2017, including by filing an affidavit from Fitzpatrick, in which he averred that, during the two conversations he had with Condron in November 2013, they discussed the production of plaintiff's personnel records, his termination for cause, his COBRA benefits, his investment in UCB, and the possibility of a global resolution of the plaintiff's claims as an employee and investor in UCB. Fitzpatrick's affidavit further stated, "I do not recall Mr. Condron discussing in those two conversations a requirement that regulatory approval from the Office of the Comptroller of the Currency was necessary for a severance payment to Mr. Rosenberger." Finally, he averred that he did not discuss with the plaintiff during his representation a requirement that regulatory approval from the OCC was necessary for a severance payment to him by UCB. The precise outcome of that motion to dismiss is not disclosed by the record before us. However, the plaintiff apparently filed a subsequent motion to stay his legal malpractice action and, after that was denied, on May 4, 2017, he voluntarily dismissed it with leave to refile.

¶ 11       On May 1, 2018, the plaintiff refiled his complaint for legal malpractice, which is the case presently before the court. In the defendants' answer, they raised the expiration of the statute of limitation as an affirmative defense. The case proceeded to discovery. On April 4, 2019, the plaintiff filed another motion to stay the case pending trial on his breach of contract case against UCB, which was then scheduled for December 9, 2019. The trial court denied that motion and ordered limited discovery on issues pertaining to the statute of limitation. On July 15, 2019, the defendants filed a motion to compel discovery into the plaintiff's communications with Fitzpatrick and attorneys from the Adducci law firm who represented him in the breach of contract action. On

August 9, 2019, the plaintiff filed a response to the motion to compel.

¶ 12     The record contains several motions to withdraw filed around this timeframe by the law firm that was then representing the plaintiff in this case. Ultimately, on September 19, 2019, that law firm was granted leave to withdraw its appearance, and the plaintiff was given until October 10, 2019, to file a supplemental appearance. No supplemental appearance was filed by the plaintiff or on his behalf until December 6, 2019, when an appearance was filed by Rathje Woodward, LLC (Rathje law firm).

¶ 13     In the meantime, on October 21, 2019, the trial court granted the motion to compel and granted leave to the defendants to file a motion for summary judgment by November 4, 2019. On November 4, 2019, the defendants filed a motion for summary judgment. However, they filed it under the docket number of 16 L 8676, the voluntarily dismissed case.

¶ 14     Thus, on November 12, 2019, the trial court entered an order granting defendants "leave to re-file motion for summary judgment, mistakenly filed under Case No. 2016 L 8676, *instanter* and *nunc pro tunc* to 11-4-19." That order also stated that the plaintiff had not appeared or responded to the motion for summary judgment, that the motion was "fully briefed," and that the motion was set for hearing and status on December 11, 2019 at 9:45 a.m.

¶ 15     In that motion for summary judgment, the defendants contended that the plaintiff's claims were barred by the expiration of the two-year statute of limitation on actions for legal malpractice. They argued that, at as a matter of law, the plaintiff's legal malpractice claim accrued no later than March 7, 2014, when, after consulting with multiple attorneys, the plaintiff filed a lawsuit against UCB for failing to pay him severance under the terms of the employment agreement. The motion for summary judgment was again supported by Condron's affidavit, which averred that he had discussions in November 2013 with Fitzpatrick, who was then the attorney for the plaintiff, about

the plaintiff's claim for severance and the fact he had told Fitzpatrick that the plaintiff was in a no-win situation because the OCC "would not likely give regulatory approval for a severance payment as required by Rosenberger's employment agreement."

¶ 16     When the defendants filed their motion for summary judgment on November 12, 2019, they served the plaintiff, who was then without counsel and had no supplemental appearance on file, with a notice of motion stating that the defendants would "present" the attached motion for summary judgment on December 11, 2019, at 9:45 a.m.

¶ 17     On December 6, 2019, when the Rathje law firm entered its appearance on behalf of the plaintiff, it also filed a motion on his behalf to set a briefing schedule on the defendants' motion for summary judgment. That motion was scheduled for presentment on December 11, 2019, at 9:45 a.m. On that date, the trial court entered an order denying the motion to set a briefing schedule but giving the plaintiff until December 18, 2019, to file a counter-affidavit in opposition to the defendants' motion. The order stated that the motion would then be taken under advisement.

¶ 18     No counter-affidavit was filed by December 18, 2019. On December 23, 2019, the trial court entered a written order granting defendants' motion for summary judgment. The trial court reasoned that when UCB terminated the plaintiff's employment, he sued UCB based on the employment agreement and attached it to his complaint. He was therefore on inquiry notice of his injury and his attorney's breach of duty either at the time he was fired or at the time he hired attorneys to sue UCB for breach of the employment agreement. The trial court also found that the plaintiff had accrued damages when he paid attorney fees to hire those attorneys. Thus, the trial court found no genuine issue of material fact that the plaintiff knew or reasonably should have known of his cause of action against defendants by March 2014, and therefore the two-year statute of limitation had expired by the time the plaintiff filed his complaint on August 31, 2016.

¶ 19    On January 21, 2020, the plaintiff filed a motion to reconsider and vacate the trial court's order granting summary judgment. It attached the January 12, 2017, affidavit of Fitzpatrick in which he averred that during the two conversations he had with Condron in November 2013, he did not recall Condron discussing a requirement that regulatory approval was necessary for a severance payment to be made to the plaintiff. The motion to reconsider argued that Fitzpatrick's affidavit demonstrated a disputed issue of fact about whether Condron actually brought the issue of regulatory approval to the attention of plaintiff's attorney in November 2013. Also attached were various pleadings and motions from the breach of contract case, purportedly demonstrating that the issue of regulatory approval was not injected into that case until UCB filed its answer on September 5, 2014. The plaintiff argued that these documents demonstrated an issue of fact about whether the plaintiff knew or should have known prior to that date that the lack of regulatory approval was a reason why UCB was not making a severance payment to him.

¶ 20    On February 6, 2020, the trial court entered an order denying the plaintiff's motion to reconsider. Although the order reflects it was denied "for reasons stated in open court," no transcript of that hearing has been included in the record on appeal. This appeal then followed.

¶ 21    II. ANALYSIS

¶ 22    On appeal, the plaintiff argues that the trial court abused its discretion by granting the motion for summary judgment without giving his newly-retained counsel an adequate opportunity to respond, and by refusing to reconsider its ruling after counsel provided the court with evidentiary materials and arguments demonstrating the existence of an issue of fact. The plaintiff argues that, if the trial court had properly considered these evidentiary materials, summary judgment would not have been entered. The plaintiff argues that the motion for summary judgment should have been decided on the merits, not on the technical ground that his response to it was slightly belated.

¶ 23    Issues of whether to set or modify a briefing schedule, grant continuances or extensions of time, and similar matters pertaining to a trial court's management of its docket are reviewed only for abuse of discretion. *TIG Insurance Co. v. Canel*, 389 Ill. App. 3d 366, 375 (2009). Here, if we viewed the trial court's ruling in isolation instead of considering the procedural history of the case, it would seem unreasonable that the trial court would not have continued the summary judgment hearing to allow the plaintiff's newly-retained counsel time to file a response and granted only seven days to file a counter-affidavit. We note also that the defendants are responsible for injecting some confusion about what would occur at the court date on December 11, 2019, because they filed a notice of motion instead of a notice of filing with the motion for summary judgment that they were refiling, stating that they would "present" that motion then, even though the prior court order had scheduled it for hearing and status at that time.[1]

¶ 24    However, we are reviewing the order of the trial court, not the actions of the defendants, and we cannot review the trial court's ruling out of context. The defendants' point is well-taken that there does appear to have been a "history of dilatory conduct" by plaintiff leading up to the trial court's order denying the motion to set a briefing schedule and granting only seven days to file a counter-affidavit. Indeed, it appears from the record before us that the plaintiff had done little by that time to advance the case since it was first filed on August 31, 2016. The trial court's ruling came on the heels of its having denied a motion to stay the case, its granting of a motion to compel the plaintiff to provide discovery involving the statute of limitation, which the plaintiff appears never to have complied with, the withdrawal of the attorneys who had been representing the

---

[1] The plaintiff overstates any problems caused by the plaintiff's filing of the motion for summary judgment using the docket number of the voluntarily dismissed action. There is no indication that the motion was substantively different than the one filed on November 12, 2019, and the trial court cured any prejudice through its order of that date by granting defendants "leave to re-file motion for summary judgment, mistakenly filed under Case No. 2016 L 8676, *instanter* and *nunc pro tunc* to 11-4-19."

plaintiff after the filing of multiple motions to do so, the plaintiff's failure to file a supplemental appearance within 21 days as required by the trial court's order and by Illinois Supreme Court Rule 13(c)(5) (eff. July 1, 2017), and his failure to appear at or send a new attorney to the two previous court appearances when a briefing schedule would logically have been discussed.

¶ 25    The trial court was in a far better position than this court to recognize what was occurring in the case before it and whether the plaintiff was engaging in dilatory conduct without making an effort to prosecute the case on its merits, thus warranting a denial of any request for further extensions. See *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196 (2007). Because of its superior position in this regard, we cannot say that the trial court abused its discretion by denying the motion to set a briefing schedule on the day the motion for summary judgment was set for hearing or by allowing the plaintiff an extension of only seven days to file counter-affidavits in opposition to the motion.

¶ 26    We also reject the plaintiff's argument that the procedure here violated the requirements of Cook County Local Rule 2.1 (amended Aug. 21, 2000), for noticing a motion, presenting it, and setting a briefing schedule. Initially, it does not appear that the plaintiff ever raised this in the trial court as an objection to proceeding to hearing on the motion for summary judgment. Nevertheless, the trial court's order of October 21, 2019, granted the defendants leave to file a motion for summary judgment by November 4, 2019, and contemplated its presentment by setting the case for status shortly thereafter on November 12, 2019. Thus, the motion did not need to be spindled or filed with a notice of motion. As the plaintiff failed to appear in court on November 12, 2019, personally or through counsel, and he failed to timely file any supplemental appearance (see Ill. S. Ct. R. 13(c)(5) (eff. July 1, 2017)), there was no indication that he intended to file a response and thus no need for a briefing schedule to be set. As such, the motion was properly considered by the trial court to be "fully briefed" as of November 12, 2019, and ready to be set for hearing on

December 11, 2019. The trial court did not violate any provision of Local Rule 2.1 by the procedure it employed here.

¶ 27    The plaintiff also argues that the trial court abused its discretion by denying his motion to reconsider the summary judgment order. Attached to that motion were Fitzgerald's affidavit of January 12, 2017, and various pleadings and motions that had been filed in the breach of contract case prior to September 5, 2014, purporting to show that the issue of regulatory approval of a severance payment was not raised in the case until that date. The plaintiff asserts that a review of this evidence demonstrates that the trial court's summary judgment ruling is erroneous.

¶ 28    The purpose of a motion to reconsider is to bring to the trial court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. A ruling on a motion to reconsider summary judgment is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 347 (2002).

¶ 29    The trial court's order denying the motion to reconsider stated that it was being denied "for reasons stated in open court." However, the plaintiff has not filed any transcript of the hearing on the motion to reconsider to enable us to understand the trial court's reasons for denying it. The plaintiff, as appellant, "has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. Here, we can conceive of a variety of bases upon which the trial court could have properly denied the motion to

reconsider. One would be that the motion presented only evidence that was available prior to the hearing but not presented, and a trial court is well within its discretion to deny a motion for reconsideration on that basis. *River Village I, LLC v. Central Insurance Cos.*, 396 Ill. App. 3d 480, 493 (2009). Without a transcript to understand the trial court's reasoning for this discretionary ruling, we have no basis upon which to hold that the trial court abused its discretion.

¶ 30 Although the reasons stated above provide sufficient grounds for affirmance, we further conclude that the trial court was correct on the merits of summary judgment. Regardless of what evidence had been presented before the motion for summary judgment or on rehearing, by March 7, 2014, the statute of limitation had started to run. By this date, the plaintiff had consulted with multiple attorneys and filed a lawsuit against UCB asserting that he was entitled to a severance payment under the terms of the employment agreement. This shows that he was clearly on inquiry notice by that date of the fact that he was injured (*i.e.*, he was not receiving the severance payment to which he believed he was entitled under the terms of the employment agreement) and the possibility that his injury had a wrongful cause. This commenced the running of the statute of limitation on the claim asserted in this case for legal malpractice.

¶ 31 A cause of action for legal malpractice "must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2014). The two-year period does not necessarily run from the day the plaintiff suffers an injury. *Racquet v. Grant*, 318 Ill. App. 3d 831, 836 (2000). Instead, under the discovery rule, " 'when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed.' " *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 86 (1995) (quoting

*Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981)). In this context, the term "wrongfully caused" is used in a general or generic sense, and it does not mean that knowledge of negligent conduct, the existence of a cause of action, or the full extent of injury must exist before the statute of limitations starts to run. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 22. Although the time when a party becomes charged with such knowledge is ordinarily a question of fact, summary judgment may be entered where the undisputed facts allow for only one conclusion. *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 250 (1994). Summary judgment is proper if the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018).

¶ 32    In its order granting summary judgment, the trial court below relied on *Nelson v. Padgitt*, 2016 IL App (1st) 160571, which presented facts similar to those of this case. That was a legal malpractice case in which the plaintiff, who was joining a new company (Launch), had hired the defendant attorney to represent him in the negotiation of an employment agreement. *Id.* ¶ 3. Launch fired the plaintiff soon after, allegedly on the basis that the employment agreement allowed for his termination if the revenue collected from clients he brought in failed to reach a certain amount within six months, which it failed to do. *Id.* ¶ 4. The plaintiff then sued Launch for breach of contract and fraud, attaching the employment agreement to his compliant and alleging in various ways that Launch had undermined his ability to reach the revenue target. *Id.* ¶ 5. Launch eventually prevailed in that case on summary judgment. *Id.* ¶ 6. After that occurred, and more than two years after he had sued Launch, the plaintiff filed a legal malpractice case against the defendants, alleging they had negligently failed to protect his interests in negotiating the employment agreement and failed to inform him of certain implications of its terms, including that he could be

fired after six months if revenues from his clients fell short of the specified target. *Id.* ¶ 7.

¶ 33    This court held that the plaintiff's complaint was not filed within the two-year statute of limitation for legal malpractice claims, because the statute began to run "when, with the assistance of a new attorney, he filed suit against Launch based on the termination and the text of the agreement." *Id.* ¶ 16. The court relied on two previous cases, explaining its reasoning as follows:

"In *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, Janousek alleged that his former business partners fired him and then froze him out of future opportunities. *Id.* ¶ 3. Janousek sued his former partners and then, three years later, sued his former attorneys at Katten, alleging that those attorneys had actually assisted his ex-colleagues in harming Janousek's business prospects. *Id.* ¶ 6. We held that Janousek waited too long to sue the Katten attorneys because he knew that he had been injured, 'even though he may not yet have known that [Katten]'s representation was partly responsible and that their conduct gave rise to a cause of action.' *Id.* ¶ 21. Janousek's claim that his partners had defrauded him 'cannot be separated' from the claim that Katten had failed to protect him from that fraud. *Id.* Like Janousek, Nelson knew he had been injured when he was fired and was informed that he was being terminated under the employment agreement. Even if Nelson did not yet know that Padgitt had been negligent in negotiating his employment agreement, he was on notice of the problem and had a duty to inquire further (by examining that agreement, the language of which made plain that it did not provide Nelson with the type of protection he asserts he asked Padgitt to ensure). *Castello v. Kalis*, 352 Ill. App. 3d 736, 745 (2004). That inquiry would have shown the intertwining of his financial loss with Padgitt's work on the employment agreement. ***

* * *

In *Carlson* [*v. Fish*], 2015 IL App (1st) 140526, Carlson settled a dispute with his former business partners through a mediation while represented by attorneys. He later decided that the settlement was inadequate and his partners had defrauded him. *Id.* ¶¶ 8-9. But he waited more than two years to sue his former attorneys, and this court upheld the trial court's dismissal on statute of limitations grounds. *Id.* ¶ 41. Similarly to *Janousek,* even if Carlson did not yet know that his attorneys were partly responsible for his injury, he knew that he had been injured. *Id.* ¶ 39. 'Carlson's identification of one wrongful cause of his injuries initiates his limitations period as to all other causes, particularly when, as here, he claims his partners engaged in fraud and the defendants failed to protect him from fraud, those claims are inseparable.' *Id.*

Again, Nelson knew in 2012 that he had been injured by his former colleagues at Launch, and he knew that the employment agreement negotiated by Padgitt was partly responsible for his inability to protect himself from the alleged wrongdoings. Like *Carlson,* his claim of malpractice against Padgitt is 'inseparable' from his claims against Launch." *Nelson*, 2016 IL App (1st) 160571, ¶¶ 17, 19-20.

¶ 34    Here, the plaintiff knew he was injured when the severance payment to which he believed he was entitled under the terms of the employment agreement was not paid. It is also evident that by the date he sued UCB, he suspected that his injury was wrongfully caused. Although his immediate suspicion may have been that UCB was the party in the wrong for not making the severance payment that he believed he was owed under the terms of his employment agreement, the holdings of *Nelson*, *Janousek*, and *Carlson* make clear that he was charged by this time with a duty of inquiry into any other potentially wrongful causes of this injury, including whether the defendants had negligently failed to obtain advance regulatory approval for a severance payment or to ensure

his employment agreement's terms actually provided for him to receive a severance payment if he was terminated without cause.

¶ 35        While the plaintiff's complaint against UCB was a fairly bare-bones complaint for breach of contract, its effect was to raise the legal issue that the terms of his employment agreement entitled him to a severance payment unless UCB had cause for his termination. And one of the terms of that employment agreement, under the heading "Regulatory Suspension and Termination," stated that "[a]ny payments made to Executive pursuant to this Agreement, or otherwise, are subject to and conditioned upon their compliance with Section 18(k) (12 U.S.C. § 1828(k)) of the FDIA." It seems unreasonable that the plaintiff, an experienced bank executive, upon realizing his severance was not being paid, could have consulted with multiple attorneys about his right to a severance payment under the employment agreement and gone so far as to file a breach of contract action without noticing this provision and questioning what it meant or what effect it had on his right to a severance payment. It would be even less reasonable for the attorneys he hired to have filed a breach of contract lawsuit against UCB without noticing this provision of the contract and analyzing whether a provision that made compliance with Section 18(k) of the FDIA a condition of "[a]ny payments" made to the plaintiff under the employment agreement was something that had been or needed to be satisfied for the plaintiff to recover a severance payment.[2] It is well-settled in this area of the law that an attorney's knowledge is considered constructive knowledge of, or imputed to, the attorney's client, and this is true regardless of whether the attorney has

---

[2] To the extent that the record does not contain specific evidence about the knowledge that attorneys from the Adducci law firm had of section 28, the work they did to determine its effect on the plaintiff's right to a severance payment, or what they communicated to the plaintiff about this issue, this appears to be due at least in part to the fact that the plaintiff never complied with the order granting the defendants' motion to compel this information. Instead, his attorneys withdrew, no timely supplemental appearance was filed by him or on his behalf, and in his absence the case proceeded to summary judgment based on the evidence then available.

actually communicated his knowledge to the client. *Kadlec v. Sumner*, 2013 IL App (1st) 122802, ¶ 30 (knowledge of facts commencing statute of limitation in accounting malpractice action). Even if his attorneys had failed to notice this provision and question its effect on his case, knowledge of it is still charged to the plaintiff as something his attorneys should have discovered through reasonable diligence. 3 R. Mallen, Legal Malpractice § 23:62 (2021 ed.).

¶ 36    As was the situation in *Nelson*, *Janousek*, and *Carlson*, the requirements of section 28 of the plaintiff's employment agreement was intertwined with or inseparable from the aspects of the employment agreement that the plaintiff sued UCB over. If the plaintiff believed that section 28 had been wrongfully included in his employment agreement, that its significance had not been adequately explained to him, or that the defendants should have obtained advance regulatory approval for a severance payment to him, he was on inquiry notice no later than March 7, 2014, of any claim against them for legal malpractice arising out of this.

¶ 37    We further reject any argument that the statute of limitations did not begin to run until UCB filed its affirmative defense raising the absence of regulatory approval as a reason the plaintiff was not entitled to a severance payment. There are two aspects to this argument. The first aspect involves notice, *i.e.*, whether the plaintiff reasonably could have been unaware that his injury had a wrongful cause until UCB raised the absence of regulatory approval as a defense in the case. We have largely addressed the notice aspect of the argument in our analysis above, holding that the plaintiff reasonably should have known by the time he filed his lawsuit against UCB of the problems posed by the inclusion of section 28 into the employment agreement, the defendants' failure to explain its significance to him, or their failure to obtain advance regulatory approval of a severance payment. Under the plaintiff's theory of legal malpractice here, he should have recognized by then that, "as a result of Section 28, his substantial contractual severance was subject

to an exerting regulatory process that threatened his payment, including the requirements of the specific regulations and the implications of including the provision in the contract." Section 28(e) had a direct bearing on the plaintiff's contractual right to a severance payment, and he should have known by then that its inclusion into his employment agreement meant that, one way or another, he or his attorneys were going to have to address whether his right to receive and keep any severance payment was affected by a need for regulators' approval. By the time he filed his lawsuit, he should have been aware that, according to his theory of malpractice, this additional legal hurdle had been wrongfully thrust upon him by the inclusion of section 28 into his employment agreement and it would need to be dealt with regardless of whether UCB specifically raised it as a defense to payment. See *Construction Systems, Inc. v. FagelHaber, LLC*, 2019 IL App (1st) 172430, ¶¶ 23-24 (plaintiff was on inquiry notice of prior attorneys' failure to give notice of mechanic's lien when successor counsel recognized notice had not been given, not when the underlying defendant raised the issue as a defense on summary judgment).

¶ 38    The second aspect to this argument involves the accrual of his malpractice claim, *i.e.*, whether it was not until UCB raised this affirmative defense that the plaintiff sustained the damages necessary to file a legal malpractice claim. A cause of action for legal malpractice does not accrue until the plaintiff sustains actual damages. *Palmros v. Barcelona*, 284 Ill. App. 3d 642, 646 (1996). The injury in a legal malpractice action is not a personal injury, nor is it the attorney's negligent act itself. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Rather, it is a pecuniary injury to an intangible property interest caused by the attorney's negligent act or omission. *Id.* For purposes of bringing a legal malpractice action, a client is not considered injured unless and until the client has suffered a loss for which he may seek monetary damages. *Id.* Where only the possibility of harm exists or damages are otherwise

speculative, actual damages are absent and no cause of action for malpractice yet exists. *Id.* at 307. Damages are considered speculative, however, only if their existence itself is uncertain, not if the amount is uncertain or yet to be fully determined. *Id.* Legal expenses that a client incurs as a proximate result of an attorney's legal malpractice are damages make a cause of action complete and thus start the running of the limitation period. *Palmros*, 284 Ill. App. 3d at 647; see also *Construction Systems*, 2019 IL App (1st) 172430, ¶ 25; *Nelson*, 2016 IL App (1st) 160571, ¶ 14.

¶ 39      Here, the existence of damages occasioned by the allegedly-wrongful inclusion of section 28 into the employment agreement was certain and not speculative by the time the plaintiff filed his breach of contract lawsuit against UCB. In other words, as discussed above, it was evident by that date that the plaintiff had or would incur legal expenses in some form to protect his interests in receiving and keeping a severance payment, because of the need to address whether regulatory approval was required as a result of the inclusion of section 28 into the employment agreement. It may not have been clear as of that date exactly how the issue would arise, but that is the nature of litigation. It could have been that UCB never seriously raised this issue as a defense to nonpayment, but even then, a reasonably careful and diligent attorney would have undertaken some investigation into the legal effect of section 28 on the plaintiff's right to accept and keep a severance payment. One way or another, it was clear by the date he filed the lawsuit against UCB that the plaintiff was going to incur legal expenses due to the position in which he had been placed by the defendants' allegedly-wrongful inclusion of section 28 into his employment agreement without obtaining advance regulatory approval for a severance payment, even if the amount of those expenses was uncertain and yet to be determined. Therefore, the actual damages necessary to bring a legal malpractice action existed as of March 7, 2014, notwithstanding the fact that UCB did not file its affirmative defense until five months later.

¶ 40                                III. CONCLUSION

¶ 41          For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 42          Affirmed.